154 N.J. Super. 576 (1977)
382 A.2d 64
MYRON W. KRONISCH AND SHEILA KRONISCH, INDIVIDUALLY AND ON BEHALF OF A CLASS, PLAINTIFFS,
v.
THE HOWARD SAVINGS INSTITUTION, A NEW JERSEY CORPORATION, INDIVIDUALLY AND AS REPRESENTATIVE OF A CLASS, DEFENDANT. HAROLD CHAMBERS AND VERAIAN CHAMBERS, HIS WIFE, INDIVIDUALLY AND ON BEHALF OF A CLASS, PLAINTIFFS,
v.
BERKELEY SAVINGS AND LOAN ASSOCIATION OF NEW JERSEY, A NEW JERSEY CORPORATION, INDIVIDUALLY AND AS REPRESENTATIVE OF A CLASS, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided October 21, 1977.
*581 Mr. Cyrus J. Bloom argued the cause for the plaintiffs.
Mr. William H. Hyatt, Jr., argued the cause for defendant The Howard Savings Institution (Messrs. Pitney, Hardin and Kipp, attorneys).
Mr. Arthur D. Grossman argued the cause for defendant Berkeley Savings and Loan Association of New Jersey (Messrs. Fox and Fox, attorneys).
LESTER, J.S.C.
This matter was remanded to this court by the Appellate Division, 143 N.J. Super. 423 (1976). The case had been certified as a class action by the trial court, 133 N.J. Super. 124 (Ch. Div. 1975), and an appeal was taken.
The appellate court reserved and remanded the matter as a "test case". The reported decisions contained a recitation of the background of this litigation. It is not necessary to repeat or expand on the facts except as may be necessary to meet the mandate before this court.
The issue here is whether a mortgagor is entitled to the profits derived from the investment of tax escrow moneys by a mortgagee operating under the mortgage instruments which describe the escrow fund as being held "in trust".
Plaintiffs Kronisch purchased their residence in Livingston, New Jersey, by the use of a G.I. mortgage with defendant. *582 The Howard Savings Institution (Howard) for $18,000.00 for a period of twenty-five years. The mortgage was executed and delivered on October 23, 1957. Mr. Kronisch has been an attorney-at-law of New Jersey since 1957 and indicated the probability of having read through the document line by line prior to its execution.
Neither before nor at the closing was there discussion of how taxes were to be paid nor did plaintiffs, prior to July 25, 1972, request to pay taxes directly or inquire whether the tax escrow was segregated from Howard's general fund or had produced any earnings for the bank.
Plaintiffs Chambers obtained an F.H.A. mortgage from defendant Berkeley Savings and Loan Association of New Jersey (Berkeley) on May 31, 1972. Prior to the closing the Chambers were told by an officer of Berkeley that the mortgage agreement required the mortgagors to pay a monthly sum for taxes and that Berkeley would make sure they were properly paid to the taxing authority.
There were no conversations or inquiries made prior to the institution of this action as to whether taxes could be paid by the mortgagors directly, or whether Berkeley would segregate the monthly escrow or pay over to the Chambers any earnings derived from investment of the escrowed funds.
The Kronisch G.I. mortgage contained the following language:
"Mortgagor, in order more fully to protect the security of this mortgage, hereby covenants and agrees as follows:
"1. Together with, and in addition to, the monthly payments of principal and interest payable under the terms of the bond secured hereby, he will pay to the Mortgagee, on the first day of each month until said bond is fully paid:
"(a) a sum equal to the ground rents, if any, next due, plus the premiums that will next become due and payable on policies of fire and other hazard insurance covering the mortgaged property, plus taxes and assessments next due on the mortgaged property (all as estimated by the Mortgagee and of which the Mortgagor is notified) less all sums already paid therefor divided by the number of months to elapse before one month prior to the date when such ground rents, premiums, taxes and assessments *583 will become delinquent, such sums to be held by Mortgagee in trust to pay such ground rents, premiums, taxes and special assessments." [Emphasis added.]
Similarly, the Chambers F.H.A. mortgage provided:
"And the Mortgagor, in order to more fully protect the security of this mortgage, does hereby covenant as follows:
"1. That, together with, and in addition to, the monthly payments of principal and interest payable under the terms of the bond secured hereby, he will pay to the Mortgagee, on the first day of each month until the said bond is fully paid, the following sums:
"(a) * * *
"(b) a sum equal to the ground rents, if any, next due, plus the premiums that will next become due and payable on policies of fire and other hazard insurance covering the mortgaged property, plus taxes and assessments next due on the mortgaged property (all as estimated by the Mortgagee) less all sums already paid therefor divided by the number of months to elapse before one month prior to the date when such ground rents, premiums, taxes and assessments will become delinquent, such sums to be held in trust to pay such ground rents, premiums, taxes and special assessments; * * *." [Emphasis added.]
These funds were commingled with the bank's general funds and were in all likelihood used for investment purposes. The bank made no disclosure to plaintiffs or any other mortgagor as to what these funds had earned, and no distribution was ever made of such earnings; nor were any charges ever made for the administrative expense of the so-called "trust".
Plaintiffs maintain that the undertaking of the respective defendants with regard to these funds involved a trust and that, accordingly, defendants, as trustees, were under an obligation to segregate the money "entrusted" to them and to apply the same to no other purpose than for that which the trust was established and that a trustee, as a fiduciary, must account for any profit or loss incurred by the unauthorized investment of trust funds.
As plaintiffs have put it, "where A delivers $100 to B in trust, that B shall pay the said $100 to C 30 days later, B is accountable for profits if in the 30 day interim he shall *584 speculate with the said $100 on the stock market and derive a profit therefrom".
Plaintiffs argue that a trust is established by the express language of the respective mortgage documents, by an analysis of the purposes of the escrow, and by operation of the theory of constructive trust.
Defendants contend that the mortgage language merely imposed on them the contractual obligation to pay taxes and insurance properly and that in the absence of any breach of this contractual obligation, the lending institutions were free to deal with the funds as they saw fit.

I. SCOPE OF INQUIRY

Before proceeding to a discussion of the merits, mention must be made of the unusual circumstances under which this litigation is being pursued. Plaintiffs had originally brought this action seeking to have themselves designated representatives of all mortgagors similarly situated in New Jersey and having defendants designated representatives of a class or classes of similarly situated mortgagees pursuant to R. 4:32.
The issue of the propriety of the trial judge approving the maintainability of the class actions, Kronisch v. Howard Savings Institution, 133 N.J. Super. 124 (Ch. Div. 1975), was reserved by the Appellate Division which held that in view of the "formidable" problems entailed in the projected class action, it would better serve the interests of the judicial system to have the matter proceed as a "test case" on remand. Kronisch v. Howard Savings Institution, 143 N.J. Super. 423 (App. Div. 1976).
"In sum, we conclude that since the decision in a `test case' may make unnecessary the management of the massive class action contemplated, maintenance of a class action is not, at this time, superior to the use of the test case approach. * * * We remand the cases of Kronisch v. The Howard Savings Institution and Chambers v. Berkeley Savings and Loan Association to the trial court. That court is to determine the liability of defendants on the issue of their rights and obligations with respect to tax escrow deposits as they arise from the language of the mortgage documents. We further direct *585 that on the remand the trial court is to exclude consideration of any defenses asserted against the named plaintiffs, such as laches, estoppel, waiver or other defense contentions unrelated to construction of the documentary language.
"The trial court is to make findings and conclusions and file them with this court * * *". Kronisch, supra, at 431.
This opinion, then, is an attempt to follow that mandate. It is apparent that the normal scope of evidentiary material has been subject to curtailment by the mandate.
It is the position of plaintiffs that the Appellate Division intended this court to look solely to the language of the mortgage documents in order to determine whether a trust was thereby created. Reliance is placed on the words, "as they arise from the language of the mortgage documents". Defendants, on the other hand, would have this court consider all extrinsic evidence that would assist it in determining the intent of the parties.
Neither party's contentions are fully acceptable. Were plaintiffs' position to be accepted, and the duty of this court were confined to a perusal solely of language in the mortgage documents, it would be difficult to conceive why the Appellate Division would have remanded the matter. The operative portion of the mortgage documents bearing upon the establishment of a tax escrow provided that "such sums to be held by mortgagee in trust to pay such ground rents, premiums, taxes and special assessments". [Emphasis added.] It would obviate the necessity for a remand "to make findings" were this court to hold that the language in question means what it purports to mean; i.e., that a trust relation is established. It would also obviate the necessity for a further hearing by a trial court were it authorized to consider only whether a trust is created by virtue of the payment, in the abstract, of money to one person for a specific purpose.
The objective of this court in construing the terms of this "contract" is, as it is in all such cases, to discern the intent of the parties and to enforce their rights as they arise from their agreement.
*586 Ordinarily, the written terms of an agreement are the sole objective manifestation of the parties' intent, and it is only by resort to the writing itself that their intent may be discovered. Extrinsic or parol evidence is, therefore, inadmissible. Naumberg v. Young, 44 N.J.L. 331, 339 (S.Ct. 1882); Ross v. Orr, 3 N.J. 277, 282 (1949). This rule of construction is equally applicable to the interpretation of trust instruments. In this regard the words of Professor Scott are appropriate:
"* * * extrinsic evidence is not admissible to show that the grantor intended that the grantee should take the property and hold it for his own benefit, free of trust, if the instrument of transfer clearly states that the grantee is to hold the property upon trust. * * *" 1 Scott on Trusts (3 ed 1967), § 38 at 301; see also, Restatement, Contracts 2 ed., §§ 235, 239 (Tent. Draft Nos. 1-7, 1973).
The question of the admissibility of extrinsic evidence does not here entail the operation of the statute of frauds, N.J.S.A. 25:1-1, et seq., since there is no dispute as to the enforceability of the underlying contract which was in writing.
The key to plaintiffs' argument is that the terms of the mortgage are clear and unambiguous. Were that so, then plaintiffs' position would be fully justified and no evidence, save the language in the documents themselves, would be admissible.
The court is not convinced that the terms in the mortgage are sufficiently precise to preclude other inquiry into the nature of the parties' understanding. It has been well recognized that the mere use of the term "in trust" does not automatically result in the creation of a trust. Abrams v. Crocker-Citizens National Bank, 41 Cal. App.3d 55, 114 Cal. Rptr. 913, 915 (D. Ct. App. 1974); 1 Scott on Trusts (3 ed. 1967), § 24 at 192; Bogert, Trusts and Trustees (2 ed. 1965), § 45 at 312-316; 3 Pomeroy, Equity Jurisprudence (5 ed. 1941), § 1009 at 1011-1016.
*587 Parol evidence is often necessary to enable a court to understand the parties' intent. As stated in Garden State Plaza Corp. v. S.S. Kresge Co., 78 N.J. Super. 485 (App. Div. 1963), certif. den. 40 N.J. 226 (1963):
"We are entirely clear that the parol evidence rule applies only to prevent the substantive alteration of contractual terms agreed upon by parties and expressed in an integration of their bargain, by resort to other prior or contemporaneous agreements or understandings. But the parol evidence rule does not even come into play until it is first determined what the true agreement of the parties is  i.e., what they meant by what they wrote down. Only when that is determined is one in an appropriate position to raise the bar of the parol evidence rule to prevent alteration or impugnment of the agreement by the asserted contradictory prior or contemporaneous agreement. In other words, interpretation and construction must necessarily precede protection against forbidden contradiction or modification. And in the process of interpretation and construction of the integrated agreement all relevant evidence pointing to meaning is admissible because experience teaches that language is so poor an instrument for communication or expression of intent that ordinarily all surrounding circumstances and conditions must be examined before there is any trustworthy assurance of derivation of contractual intent, even by reasonable judges of ordinary intelligence, from any given set of words which the parties have committed to paper as their contract. Construing a contract of debatable meaning by resort to surrounding and antecedent circumstances and negotiations for light as to the meaning of the words used is never a violation of the parol evidence rule. And debatability of meaning is not always discernible at the first reading of a contract by a new mind. More often it becomes manifest upon exposure of the specific disputed interpretations in the light of the attendant circumstances.
"The foregoing is fundamental doctrine. * * *" Garden State Plaza Corp., supra, at 496.
Since plaintiffs would have the court define the respective rights and obligations arising from their agreements and since the mortgage documents themselves are silent as to details of administration, it is incumbent upon this court to inquire into all permissible sources of evidence in order to render its findings.
According to our mandate, specifically barred from this inquiry are such defenses as "* * * laches, estoppel, waiver or other defense contentions unrelated to construction of *588 the documentary language." Kronisch, supra, 143 N.J. Super. at 431.
This right would prevent inquiry into defenses which may have arisen subsequent to the establishment of the primary rights flowing from the agreements themselves. This is an essential part of the "test case" approach, since it is contemplated that individual, variable defenses would weaken the collateral estoppel effect of a judgment by this court. This court will not, however, bar from consideration evidence of conduct in relation to the mortgage undertaking which may illuminate the very meanings of the terms themselves and, thereby, aid in establishing the parties' primary rights under the contract. The various sources of evidential material to be used in interpreting the existence of a trust have been set forth in the Restatement, Trusts (2 ed), § 12(g) at 37:
"Manifestation of intention. If one person pays money to another, it depends upon the manifested intention of the parties whether a trust or a debt is created. If the intention is that the money shall be kept or used as a separate fund for the benefit of the payor or a third person, a trust is created. If the intention is that the person receiving the money shall have the unrestricted use thereof, being liable to pay a similar amount whether with or without interest to the payor or to a third person, a debt is created.
"The intention of the parties will be ascertained by a consideration of their words and conduct in the light of all the circumstances. Among the circumstances which may be of importance in determining the intention of the parties are: (1) the presence or absence of an agreement to pay interest on the money paid; (2) the amount of money paid; (3) the time which is to elapse before the payee is to be called upon to perform his agreement; (4) the relative financial situation of the parties; (5) the relations between the parties; (6) their respective callings; (7) the usage or custom in such or similar transactions."
The last item  that of custom and usage  has become a matter of no little importance to the litigants in this action and will be discussed hereinafter.
This matter was on the court's own motion and, in general, over the objection of all counsel, treated in a summary manner pursuant to R. 4:67. Yet, not one basic, relevant fact *589 (except perhaps as to custom and usage) is now in issue. Stipulations, affidavits, depositions, discovery and documentary evidence were all utilized.
If all of the "issues" raised by the parties were fully litigated in a plenary manner, many additional months of trial would have been required. Competent counsel through the means noted, through some four hundred pages of briefs, through voluminous documentation and with a comparatively few days of oral argument have presented a clear and complete picture to the court without one witness being called. Counsel deserve great credit.

II. THE MEANING OF THE MORTGAGE DOCUMENTS

Plaintiffs maintain, first, that the words employed in the documents unequivocally indicate the existence of a trust. "The language is as clear as words will permit * * *." How much more precisely could the parties have memorialized the establishment of a trust other than by the language that was utilized? In what way could that have more specifically expressed an intention to create a trust other than by the use of the words, "to be held in trust"? The answer to this challenge is to recall that words are only guides to intentions; that a relation described as a "trust" may be a legal misnomer if the relationship, in fact, is otherwise.
As previously stated, it is generally acknowledged that mere use of the term "in trust" does not necessarily indicate the existence of a trust and that a trust can be created, as well, without use of the term, "trust". Brooks v. Valley Nat'l. Bank, 113 Ariz. 169, 548 P.2d 1166, 1171 (Sup. Ct. 1976); Surrey Strathmore Corp. v. Dollar Savings Bank of New York, 36 N.Y.2d 173, 366 N.Y.S. 107, 325 N.E.2d 527, 529 (Ct. App. 1975); Restatement, Trusts (2 ed.) § 24, Comment.
"* * * The declaration of trust, whether written or oral, must be reasonably certain in its material terms; and this requisite of certainty *590 includes the subject-matter or property embraced within the trust, the beneficiaries or persons in whose behalf it is created, the nature and quantity of interests which they are to have, and the manner in which the trust is to be performed. If the language is so vague, general, or equicoval that any of these necessary elements of the trust is left in real uncertainty, then the trust must fail. * * *" 3 Pomeroy, Equity Jurisprudence (5 ed. 1941), § 1009 at 1012-1013.
Far more important than the use of technical language in identifying the intent of the parties is an examination of the purposes of relationship, for it is highly evidential that a trust exists if the purposes of the agreement are best effectuated by use of a trust rather than some other relation. See 89 C.J.S., Trusts, § 43 at 776.
Plaintiffs posit that, even excluding the quoted language, the relation between a bank and a depositor itself constitutes a trust.
In the ordinary bank deposit, the bank is free to use the sum deposited as its own pursuant to a contractual obligation to repay with interest. In this situation, a debtor-creditor relation is established. Scott, op. cit., § 524 at 3668, § 526 at 3670.
At the opposite extreme, a bailment is created when a bank accepts money, securities or other items of value for the purpose of safekeeping. In this situation, it is incumbent upon the bank to tender back the identical thing deposited. Maurello v. Broadway Bank & Trust Co., 114 N.J.L. 167, 173 (E. & A. 1935).
Plaintiffs characterize the deposit in the instant case as yet a third type of bank deposit  that of a deposit for a specific purpose. An important line of cases has recognized that a type of trust, not a mere debt, arises in such cases where money is deposited with a bank for payment to a third party for a specific purpose. Deal v. Asbury Park & Ocean Grove Bank, 118 N.J. Eq. 297 (E. & A. 1935); State v. Platte Valley State Bank, 130 Neb. 222, 264 N.W. 421 (Sup. Ct. 1936). See also, In re Interborough Consol. Corp., 288 F. *591 334 (2 Cir.1923), cert. den. 262 U.S. 752, 43 S.Ct. 700, 67 L.Ed. 1215 (1923).
The distinction between a general deposit and a deposit for a special purpose was critical in these cases which dealt primarily with the problem of certain accounts in banks which had failed. The distinction was explained in the case of Andrew v. Union Sav. Bank & Trust Co. of Davenport, 220 Iowa 712, 263 N.W. 495 (Sup. Ct. 1935), at 497:
"* * * It is well established that in the ordinary transaction where a depositor puts money in a bank, the money becomes the bank's money and the bank owes the depositor a debt. The relation of debtor and creditor is created between the bank and the depositor. * * * A different rule applies where money is merely left with the bank under an arrangement with the bank that the money is to be used by the bank for some special purpose as, for example, to turn over to a particular person or to pay a particular debt. In all such cases the money does not become the property of the bank. The fund is merely intrusted to the bank as a trustee or bailee without any authority on the part of the bank to use it as its own. Such a deposit is said to be a special deposit. No relationship of debtor and creditor is created between the bank and the person making the deposit in such a transaction. Where the bank fails in such a situation, the owner of the fund has a right to claim it and to receive preference in payment of it where it passes into the hands of the receiver. This is because he is not a creditor of the bank at all in the ordinary sense, but the bank has property in its possession which belongs to him. * * *"
Plaintiffs' argument, accordingly, is that defendants, as holders of deposits for a special use, were fiduciaries for the mortgagors and were not authorized to treat the funds as their own and employ them for general banking purposes nor commingle them with their general funds.
Defendants' first response to plaintiffs' analysis (i.e., that the tax escrow did not constitute a bank deposit at all but rather partook of a mortgagor-mortgagee relation) is well taken. Had the same mortgage documents been used by a mortgagee which was not a bank, plaintiffs could not employ the above argument that the documentary language itself indicated the existence of a trust relation.
*592 Furthermore, authority is not unanimous that the payment of sums to a bank for subsequent repayment to a third party is necessarily a trust for the benefit of the depositor. Several cases have determined to the contrary  that mortgagors, once having paid their tax escrow, have no right to these funds save for the right to have them applied to the purposes for which the deposits were made. In re Simon, 167 F. Supp. 214, 215 (E.D.N.Y. 1958); Central Suffolk Hospital Ass'n v. Downs, 213 N.Y.S.2d 192 (N.Y. Supr. Ct. 1961); Sears v. First Federal S. & L. Ass'n., 1 Ill. App. 3rd 621, 275 N.E.2d 300 (App. Ct. 1974).
The very fact that plaintiffs had no right to the refund of their payments is a telling indication of the distinction between the case at bar and the ordinary banking situation, wherein a depositor is vested with the right to the refund of his deposit. Having found that the mortgagors retained no right to the specific funds, there is no res upon which a trust may be based. Sears v. First Federal S. & L. Ass'n., supra.
The cases cited by plaintiffs in support of their theory that the banking relation itself established a trust also disclose a pattern in which the money posted by the depositors was clearly and intentionally segregated from the bank's general funds and designated for a special use. Maurello v. Broadway Bank, supra, 114 N.J.L. at 168; Deal v. Asbury Park, supra.
Segregation of funds is one of the prime indicators of the existence of a trust. In the present case the admitted failure of defendants to segregate the advance tax escrow funds can only be actionable if it is first assumed that there was some duty to segregate those funds. Since the mortgage documents themselves do not indicate any such duty, it is evidential of the nonexistence of a trust relation that there was, in fact, no segregation rather than being evidential of a breach of a trust relation by defendants.
Again, assuming that the tax escrow payments amounted to bank deposits, it is not conclusive that defendant's *593 obligation to pay to a third party created a trust relation. Eminent authority has seriously questioned holdings in the "bank failure" cases which interpreted the law of trusts so as to maximize the claims of a certain class of depositors, asserting the better-reasoned opinion that, in the ordinary case, no trust relation arises from the mere fact that a payment has been made to a bank for a special purpose.
"* * * [T]here are numerous cases in which the court held that the depositor was entitled to priority over the general creditors of the bank. In many of these cases the court seemed to think that the mere fact that the deposit was made for a special purpose was enough to indicate that a trust and not a debt was created. In the absence of evidence of a different intention, however, it seems clear that the depositor does not intend that the bank should deal with the money in any manner different from that in which it would deal with ordinary general deposits. There may be, indeed, a direction by the depositor indicating that the bank is not to use the money as its own, or there may be circumstances indicating that such is his intention. In the absence of such indication, however, the inference should be that the bank is entitled to use the money as its own. "* * * The question usually comes up when the bank has failed and the depositor seeks priority, and one cannot escape the feeling that the courts have been largely influenced by sympathy for the depositor. Such sympathy, it is believed, should be more widely distributed, since it is unfair to the other depositors to give priority to a particular class of depositors. The general rule that equality is equity is a healthy rule and no claimant should be given priority over others unless he can show why the giving of such priority is not unfair to the others. The mere fact that a deposit is made for a special purpose is not a sufficient reason, unless there is an understanding that the money deposited should not be used as a part of the general assets of the bank.
"It would seem that the presumption is that when a bank receives money it is intended that the bank should use the money; and the burden is on the depositor to show that the understanding was different. * * *" Scott, op. cit., § 530 at 3682-3685.
It is proper to inquire what the purposes of the tax escrow were and whether, in view of these purposes, the parties to the agreement had any particular expectation concerning the manner in which the escrow was to be administered.
*594 In the ordinary case of deposits for a special purpose, the bank, as repository, acts as a conduit for the benefit of its depositor and, hence, must insure that the purposes of the relation are not defeated by the commingling of funds. In the case at bar it is clear that the escrow payments were demanded by the mortgagees for the benefit of the mortgagees.
Plaintiffs' home purchases were financed in large part with funds furnished by defendants. In each case the home is the sole source of security for the loan, which security could be defeated or compromised by a failure on the part of plaintiffs in the payment of taxes and assessments or by any uninsured loss. For the purpose of "further securing" their principal source of security, the mortgagees required that all taxes, assessments and insurance premiums be paid to them monthly. All costs of administration were absorbed by the mortgagees. The history of tax escrows confirms the view that the true "beneficiary" of the escrow agreement has always been the mortgagee.
In the 1930's substantial numbers of foreclosures were caused by inability to pay annual assessments. As a result of this, banks began to require monthly tax payments. The theory was that individual homeowners, especially small borrowers, would find it easier to make monthly payments of one-twelfth the yearly taxes than to meet the annual bill in a single payment. The practice has continued ever since. Buchanan v. Brentwood Federal S. & L. Ass'n., 457 Pa. 135, 320 A.2d 117, 121 (Sup. Ct. 1974).
Given this background, it is difficult to imagine why a bank would insist on holding the sums in a trust fund with severe restrictions on use rather than to hold these funds as a debt and derive a profit from their use. The mere fact that money was paid to defendants to pay over to third parties does not by itself qualify the arrangement as a trust. Indeed, in the case of bank deposits, these arrangements presumptively created a debt rather than a trust.
"Where the deposit is in escrow, that is where the money is to be paid to a third person on the happening of a designated event *595 and in the meantime the depositor has no right to withdraw the money, it depends upon the manifestation of the intention of the parties whether the bank may use as its own the money deposited or whether the money shall be held in trust. Such a deposit ordinarily indicates an intention that the bank may use the money as its own, the bank undertaking to pay to the third person the amount of the deposit on the happening of the designated event." Restatement, Trusts 2d, § 12 at 42. See also, Bogert, Trusts and Trustees (2 ed. 1965) § 21 at 157; Restatement, Trusts 2d, § 12 at 37.
In the present case (a) there was no written agreement to pay interest on the money paid. The absence of such a writing and, indeed, the absence of any agreement as to investments, retention of earnings or of periodic accountings is particularly impressive where, as here, the remaining portions of the agreement were exhaustively detailed; and (b) as Judge Antell noted in 1975: "* * * The stakes for the individual mortgagors are * * * minimal." Kronisch, supra, 133 N.J. Super. at 131.
The time lapse before the payee is to be called upon to perform his agreement is relatively short  never more than four months for taxes collected quarterly. Hence, it is held that the accumulation of interest by the defendants and the concomitant deprivation of interest on the part of the mortgagors on these sums did not figure significantly in the expectation of the mortgagors.
Additionally, the parties were completely unequal in bargaining and financial positions. Defendants drafted the agreements and offered them to prospective homeowners on a take-it-or-leave-it basis. It strains credulity to imagine that defendants would gratuitously agree to forego interest on advance tax escrow moneys where there would be no illegality or impropriety in holding those moneys as their own. If a trust relationship were intended, would not, or could not, the trustee have demanded a "commission" or perhaps a higher interest rate?
Solely on the basis of the dealings between the litigants and the manifestations of intent and understanding at the time the agreements were executed, the court finds that *596 plaintiffs have failed in their attempt to prove a trust. Rather, the agreements established a contractual duty of defendants to apply the escrowed moneys to their designated purpose and that such funds were at all times prior to the date of payment over to third parties general funds of defendants. This conclusion is supported by every other State that has considered the question. Carpenter v. Suffolk Franklin Savings Bank, Mass., 346 N.E.2d 892, 900 (Sup. Jud. Ct. 1976); Brooks v. Valley Nat'l. Bank, supra, 548 P.2d at 1171; Lathrop v. Bell Federal S. & L. Ass'n., 355 N.E.2d at 673-674; Durkee v. Franklin Savings Ass'n., 17 Ill. App.3d 978, 309 N.E.2d 118, 122 (App. Ct. 1974).
Plaintiffs' attempt to distinguish these and other cases is ineffectual as to the basic policy and holding espoused.
While defendants, by commingling the escrow funds with their general funds for investment purposes, assumed the risk that they might not be able to complete payments of taxes, assessments or insurance, no such breach of contractual duty is here alleged. If there were any contractual duty to segregate, defendants' failure to do so would be injuria absque damno. Additionally, because of this conclusion the court finds that earnings, if any, derived by defendants from their investment of tax escrow moneys do not constitute unjust enrichment so as to impose on defendants a constructive trust in favor of mortgagors.

III. CUSTOM AND USAGE

The court would ordinarily find it unnecessary to consider one important avenue of proof offered by defendants and, thus, would be avoided the only contested issue of basic fact  that is, whether the custom and usage indicated that defendants did not create, and did not intend to create, a trust relationship or any other arrangement which might require payment of interest or an accounting for profits from tax escrow funds.
It is claimed by defendants that the general understanding of the mortgage-lending industry is that advance tax *597 escrow funds are not to be administered by mortgagees as trusts. Defendants argue that this understanding in the industry is a recognized "custom and usage", evidence of which should be considered by this court in determining the meaning of the mortgage documents.
Evidence of custom and usage, properly pleaded, is relevant; yet, the court is concerned with the proper scope of its trial of the case on remand. In modifying the opinion of the first trial court approving the maintenance of class actions, the Appellate Division voiced concern as to certain "formidable problems" which might arise if the numerous classes of mortgagees and mortgagors tried their cases collectively.
"* * * These problems include: (1) the expense of giving the notice required by R. 4:32-3(b) to the hundreds of thousands of members of plaintiff class and the hundreds of members of defendant class, and the question of who is to bear such expense; (2) the determination (including discovery procedures) of possible individual claims and defenses which might require the creation of sub-classes, including, according to defendants, which members of the plaintiff class (a) have had their advance tax payments `capitalized', (b) have had their advance tax payments maintained in a separate, noninterest-bearing demand deposit account, (c) have executed GI or FHA mortgage forms containing different language, (d) executed and paid off their GI or FHA mortgages before the Kronisch or Chambers mortgages were executed or before the New Jersey Anti-trust Act was passed, (e) have mortgages which are in arrears, in default or in foreclosure, (f) asked for permission to pay their taxes directly or inquired whether interest or earnings would be paid them with respect to advance tax payments, (g) read and understood their GI or FHA mortgages, while others did not read them at all or did not understand or misunderstood what they read, (h) expressed their understanding or had explained to them the bank's interpretation of the words `in trust' in their GI or FHA mortgages, (i) borrowed from nonsupervised FHA mortgagees, or (j) are depositors in Howard or Berkeley; * * *". [143 N.J. Super. at 428]
It was for these and other reasons that the "test case" approach was deemed superior to the class action approach originally contemplated. There is no question in the court's mind that evidence of "* * * the usage or custom in such *598 or similar transactions." [Restatement, Trusts 2d, § 12 at 37] is evidential. Such evidence would show a manifestation of intent. Plaintiffs, however, moved to strike those affidavits proffered by defendants in this summary hearing, indicating that:
1. Failure to strike would deprive plaintiffs of a due process right to cross-examination.
2. Discovery was in order.
3. The affidavits (and other evidence) do not support a conclusion that the usage or custom was as presented by defendants.
If custom and usage were to be a determinative factor in the case, the trial court would necessarily embark on a protracted inquiry into industry practices and understandings which would far exceed the boundaries of the fact patterns requested in this "test case".
Defendants, in furtherance of their contentions relating to custom and usage, have already filed numerous affidavits and reports which raise important factual issues, each of which would be subject to discovery and plenary determination. Had such issues been contemplated by the Appellate Division, a decision on remand by this court would not have been ordered within four months. 143 N.J. Super. at 431.
It was, therefore, the decision of this court that such affidavits submitted by defendants for the purpose of furthering their claims of custom and usage be stricken. Were this court authorized to accept such evidence, the position of defendants that no trust was created could only be further confirmed.
The court does not, however, intend to avoid the legal question presented. Assuming that custom and usage evidence did not exceed the scope of the instant remand, plaintiffs' next objection to its inclusion is that the elements necessary to establish custom and usage are missing. As the court expressed it in Steward and Metler v. Scudder, 24 N.J.L. 96 (Sup. Ct. 1853):
*599 "Usage cannot be proved by isolated instances, but must be so certain, uniform, and notorious that it must be presumed to have been understood by the parties as entering into and constituting a part of the contract. * * *" [at 106]
And, even when the contracting parties are engaged in the same trade or business, the claimed usage must be clearly established. As our Supreme Court expressed it:
"* * * The alleged custom, if pleaded, must then be clearly established and must be known to the parties to be so notorious in the trade as to charge them with notice thereof. * * *" Johnson v. Hoffman, 7 N.J. 123 (1951) at 133.
While it is ordinarily the case that where unique meanings are employed, a party may not be bound by a custom and usage unless he is actually informed of the special meaning prior to the execution of contract [Am. Litho. Co. v. Commercial Ins. Co., 81 N.J.L. 271, 274-275 (Sup. Ct. 1911)] it is also true knowledge of well-established customs and usages of banks are "binding on persons dealing with a bank whether or not they have actual knowledge thereof." 25 C.J.S., Customs and Usages, § 9 at 113.
The court finds that were the proffered affidavits received into evidence and were they unrebutted, they would indeed indicate a universal practice among mortgage lenders not to pay interest on earnings derived from tax escrows directly to mortgagors nor to establish a separate account in the name of, or for the benefit of, mortgagors.
Plaintiffs have offered no probative proof to the contrary and by the bringing of the instant litigation, wherein all VA and FHA lenders were sought to be grouped as a class, implicitly admit the existence of a continued course of conduct on behalf of these mortgagees in not paying interest and not segregating escrow accounts in the name of, and for the benefit of, mortgagors. Whereas plaintiffs regard these practices as nonfeasance and actionable, defendants and the court would regard these practices as indications of what the parties had in mind when their agreements were made.
*600 In view of the court's holding that plaintiffs have failed to prove the existence of a trust and that a debt rather than a trust was created under the instant agreements despite the use of the terminology "in trust", evidence of custom and usage is not a factor in, but rather would be a confirmation of, the court's holding.

IV. CONCLUSION

The court recognizes and acknowledges plaintiffs' contribution in bringing the present action. An important question, potentially affecting thousands of homeowners and hundreds of lenders, has been most ably put to the test. The fact that buried within a document were words which literally indicate a trust might very well lead a reader to conclude that the parties to the contract were bound to each other via the unique legal rules attendant to trusts. There clearly was no meeting of the minds with respect to any aspect of a trust relation and, yet, the terminology of trusts does remain in the contract, creating anew the possibility of misinterpretation. This anomalous situation is one which is properly subject to judicial review. Ultimately, however, it is a legislative choice whether, in the future, further obligations should be imposed on mortgagees to segregate escrow moneys and account for all profits derived therefrom in a manner similar to the handling of rental security deposits. N.J.S.A. 46:8-19, et seq. But what should be done pending legislation?
While this court afforded no relief to plaintiffs, it should and will consider the "class" never established. That class had, and future mortgagors have, a right to know if a "trust" is being established. The utilization of the word "trust" in the face of a contrary intent is inappropriate. Be this a property or personal right, it is one which should once and for all be settled.
A court of equity has a duty to afford a practical remedy to protect the future rights of mortgagors and, therefore, *601 directs that mortgages entered into after January 1, 1978, eliminate this inappropriate language, i.e., "to be held in trust".
Clear, understandable language is the modern trend.
These plaintiffs have accomplished a goal in protecting future mortgagors from the dilemma presented by the language in question.
Because of its advocacy of an important and challenging issue, both on behalf of the named plaintiffs and the public at large, the court would be inclined to award counsel fees to defray the large burden carried by plaintiffs and their attorney. Were it in the court's power to do so, it would surely so act. Counsel is invited to examine the subject and to move for counsel fees if a theory to sustain them is available.
Costs are to be taxed against defendants.