TELECOM INTERNATIONAL
AMERICA, LTD.,
Plaintiff,

v.

AT & T CORP., Defendant.

AT & T Corp., Counterclaim–Plaintiff,

v.

Telecom International America, Ltd.
and Telecom International Co., Ltd.,
Counterclaim–Defendants.

AT & T Credit Corporation,
Third–Party Plaintiff,

v.

Telecom International America, Ltd.,
Third–Party Defendant.

Telecom International America, Ltd.,
Fourth–Party Plaintiff,

v.

AT & T Corp., Fourth–
Party Defendant.

No. 96 Civ. 1366(AKH).

United States District Court,
S.D. New York.

Aug. 13, 1999.

Aurora Cassirer, Jaime L. Weiss, Parker Chapin Flattau & Klimpl, New York, New York, for Plaintiff and Counterclaim-Defendant, Third–Party Defendant, Fourth–Party Plaintiff Telecom International America, Ltd., and Counterclaim-Defendant Telecom International Co., Ltd.

Alan M. Unger, Elizabeth M. Sacksteder, Sidley & Austin, New York, New York; Sharon O. Gans, AT & T Corp., Liberty Corner, New Jersey for Defendant and

Counterclaim–Plaintiff, Fourth–Party Defendant AT & T Corp.

Robert Leonard, Jeffrey S. Lipkin, Shanley & Fisher, P.C., Morristown, New Jersey, for Third–Party Plaintiff AT & T Credit Corporation.

## MEMORANDUM AND ORDER

HELLERSTEIN, District Judge.

Plaintiff, Telecom International America, Ltd. ("TIA"), a reseller of long-distance "800" service, and defendant AT & T Corp. ("AT & T"), a telephone company which provides both telecommunications services and equipment, are parties to three contracts. Two of the agreements cover purchases and sales of telephone equipment manufactured and designed by AT & T, and the other covers the utilization by TIA of certain of AT & T's long-distance telephone services. TIA claims in this lawsuit that the contracts are parts of an "overarching" agreement to provide "end-to-end" service that AT & T breached, and that AT & T is liable to TIA for damages flowing from this breach and for various unfair and otherwise illegal practices. AT & T denies liability, denies the existence of any such "overarching" agreement and counterclaims for sums due under its contract tariff filed with the Federal Communications Commission (the "FCC"). The damages respectively claimed are substantial: TIA seeks an aggregate total of at least $187 million, while AT & T seeks approximately $59 million.

After eighteen months of extensive discovery, AT & T moved for summary judgment dismissing the bulk of TIA's claims, and for partial summary judgment with respect to its four counterclaims. I grant AT & T's motion in part, and deny it in part.

## STATEMENT OF FACTS

In early 1994, TIA's parent, Telecom International, Ltd. ("Telecom International"), undertook to provide a high quality, reliable long-distance telephone service to Japanese subscribers at lower rates than those available from other Japanese providers. The parent, Telecom International, was a reseller of telephone services and a dealer in telecommunications equipment to the Japanese market. Telecom International opened discussions with equipment manufacturers toward purchasing available and specially designed equipment to provide a "call-turnaround" application, to be marketed under the name "Diamond Net," capable of linking two telephone calls: a long-distance call over a toll-free line from Japan to a switching station in New York (the "inbound call"), with a linked call from New York to the number anywhere in the world dialed by the Japanese subscriber (the "outbound call"). (Affidavit of Eamon Joyce, dated Nov. 19, 1998 ("Joyce Aff."), at ¶ 4 n. 1; AT & T's Statement Pursuant to Local Civil Rule 56.1 ("AT & T 56.1"), at ¶¶ 5–8). Telecom International provided AT & T with projections estimating that Diamond Net would capture 15% of the Japanese long-distance market, sell over two million minutes per month of long-distance services and contract with over 2,000 customers during the first year of operations. (TIA's Statement Pursuant to Local Civil Rule 56.1 ("TIA 56.1"), at ¶¶ 8, 21).

AT & T negotiated to provide both the telecommunications services and the equipment that were needed for Diamond Net, representing that its equipment, combined with its international long-distance network services, could provide the efficiency of "end-to-end" service, linking and completing the envisioned calls in "less than a nanosecond." (TIA 56.1, at ¶ 12). AT & T promised better service and benefits than competitors like Northern Telecom, even though the equipment available from such other companies was also compatible with AT & T telecommunications services, and there was no technological reason forcing TIA to purchase both equipment and long-distance services from one company. (Affidavit of Jacques Richard, dated May 8, 1997 ("Richard May 8

Aff."), at ¶ 6). Thus, AT & T represented in its effort to obtain TIA's business:

> When Telecom International selects Megacom 800 International and Megacom Wats Services [the AT & T services to be utilized for the inbound call to New York, and the switched outbound call], you are selecting a solution that is "all AT & T" from design through delivery. AT & T Bell Laboratories designed these services and engineered its software. AT & T Network Systems, which won the 1992 Malcolm Baldridge Quality Award, manufactures the network's components. The AT & T Business Network Sales Division installs and maintains Megacom 800 International and Megacom Wats to AT & T's rigorous standards.

(TIA 56.1, at ¶¶ 12–17). Furthermore, AT & T represented that its equipment had been utilized previously in conjunction with its network services in similar configurations as contemplated by TIA. (*Id.* at ¶ 3).

AT & T recommended the network services and the use of customized equipment to be purchased: AT & T's Megacom 800 service for the incoming call from Japan to the U.S.; AT & T's Megacom service for the outbound call; a customized G3r switch to bridge the calls; a Conversant Series 4.0 automated voice response system to couple the inbound to the outbound call; and a T–45 cable to connect the Megacom 800 and Megacom services to the switching equipment. (TIA 56.1, at ¶ 24). AT & T's materials stated that the configuration could support call volumes of up to 1775 calls per busy hour with an average duration of 3.5 minutes. (TIA 56.1, at ¶ 7). AT & T recommended that Tapestry Computing Co. ("Tapestry"), a company comprised mostly of former AT & T em-

ployees, design and write the software necessary to implement the application. (*Id.* at ¶ 25). At the time of contracting, AT & T did not provide a single long-distance tariffed service, which could carry both the inbound and outbound calls without requiring a switch to connect the calls. (Richard May 8 Aff., at ¶ 7). A separate service and corresponding tariff would have had to have been developed and filed.

### The Equipment Purchase/Service Agreement of May 1994

On May 3, 1994, AT & T and TIA (which by then had been incorporated by Telecom International) entered into a written equipment purchase and service agreement (the "Equipment Agreement") providing for the sale by AT & T to TIA of approximately 150 items of equipment for an aggregate price of $527,916.17.[1] The Equipment Agreement, a form contract used by AT & T for many years, provided the terms and conditions of the contractual relationship between AT & T and TIA with regard to these items of equipment. (Kelly Aff., at ¶ 10). The Equipment Agreement, however, did not incorporate the representations made by AT & T during the period of negotiations and in their proposals; indeed, it largely excluded them. In capital letters, the Equipment Agreement excluded any warranty of merchantability or fitness; Section 8 provided:

> A. Except as stated in Sections 6 and 7, AT & T, its subsidiaries and their affiliates, subcontractors and suppliers make no warranties, express or implied, and specifically disclaim any warranty of merchantability or fitness for a particular purpose.

(Equipment Agreement, at § 8(A)).[2] Moreover, AT & T disclaimed any warranty of error-free operation, or that the

---

1. The Equipment Agreement is dated April 27, 1994, and TIA executed it on April 29, 1994. (Affidavit of Marianne Kelly, dated May 8, 1997, Exhibit A ("Kelly Aff.")). The purchase price for the equipment was adjusted upward by AT & T Credit Corporation, the finance lessors of the equipment, to include finance taxes and other charges.

2. Section 7 of the Equipment Agreement specified the terms of the software warranty, not covered in Section 6, which terms provided for a 90–day warranty for AT & T software, and for a full refund if AT & T was unable to remedy material problems with the software. (*Id.* at § 7).

equipment would meet TIA's specific requirements. Section 8 thus continued:

D. AT & T does not warrant uninterrupted or error free product operation or that the software functions will meet your requirements. Although AT & T has used reasonable efforts to minimize defects or errors in the software except as stated in Sections 6 and 7, you assume the risk of any damage or loss from the use of or inability to use the software.

(*Id.* at § 8(D)). The single warranty provided by the Equipment Agreement was that the equipment sold by AT & T would perform in accordance with AT & T's standard specifications. Thus, in Section 6, AT & T warranted that:

... on the Delivery or In–Service Date, whichever is applicable, and during the warranty period, the equipment and associated operating system software (basic software acquired with the equipment that enables it to function) will operate in accordance with AT & T's standard specifications.

(*Id.* at § 6). The warranty period was to last one year and AT & T agreed to provide maintenance service at no additional cost for the warranty period; TIA could receive post-warranty period maintenance at additional cost. (*Id.* at §§ 6, 9).

The Equipment Agreement also limited the remedies available to TIA as well as the extent of liability to which AT & T could be held. In particular, the terms of the Equipment Agreement asserted that:

... AT & T shall not be liable for incidental, indirect, special or consequential damages, or for lost profits, savings or revenues of any kind, including but not limited to charges for common carrier telecommunication services or facilities accessed through or connected to products, whether or not AT & T has been advised of the possibility of such damages.

(*Id.* at § 17(C)). This clause, like the others detailed above, was also in all capital letters.

In addition, the Equipment Agreement contained an integration clause, which in capital letters, stated:

H. This is the entire agreement between the parties with respect to the products and services provided hereunder and supersedes all prior agreements, proposals, communications between the parties and understandings, whether written or oral.

(*Id.* at § 22(H)). The Equipment Agreement was to be "construed in accordance with and governed by the local laws of the state of New Jersey." (*Id.* at § 22(G)).

In light of the fact that TIA did not have a large technical or support operation, and sought to outsource the maintenance and storage responsibilities for the equipment, it did not want to have primary responsibility over storage and maintenance of the equipment. (Joyce Aff., at ¶ 9). Consequently, much of the equipment purchased by TIA was housed at Telehouse, a facility in Staten Island, which was owned in part by AT & T. (Joyce Aff., at ¶ 25; Affidavit of Jacques Richard, dated March 4, 1996 ("Richard March 4 Aff."), at ¶ 4). Telehouse was specifically designed to house, maintain and keep secure computer and telecommunications equipment, and was the central base of operations for Diamond Net's equipment. (TIA 56.1, at ¶ 10).

TIA sought financing for the purchase price of the equipment, and third-party plaintiff AT & T Credit Corporation ("AT & T Credit"), recommended by AT & T, agreed to provide such financing, secured by a lease of the equipment purchased by TIA. In connection with the lease, TIA and AT & T Credit executed a Master Equipment Lease Agreement (MELA) providing secured financing for the $527,916.17 purchase price. The MELA provided for monthly payments by TIA to AT & T Credit over a term of thirty-six months,

and also included acceleration provisions for default.

### *The Contract Tariff Order and the Terms of the Filed Contract Tariff*

The telecommunications services purchased by TIA were also made the subject of a specific contract. Pursuant to a contract tariff order (the "CTO")[3] executed by the parties, TIA ordered and AT & T agreed to provide the "inbound" Megacom 800 and the "outbound" Megacom telecommunications services, both to be governed by specific tariffs incorporated by reference in the CTO. The CTO was a simple one-page agreement comprised of twelve paragraphs. Similar to the Equipment Agreement, the CTO disclaimed almost all warranties. Thus, Paragraph Five of the CTO provided, in bold-faced capital letters:

> Except for any warranties expressly made in the [contract tariff] or the applicable tariffs, AT & T excludes all warranties, express or implied, including but not limited to any implied warranties of merchantability and fitness for a particular purpose. AT & T's liability to customer is subject to the limitations stated in the [contract tariff] and applicable tariffs.

(CTO, at ¶ 5).

The CTO also contained an integration clause, superseding the prior negotiations between the parties, and providing that only the terms of the CTO and the filed tariffs were binding. Consequently, the CTO constituted the:

> [e]ntire agreement between the parties with respect to the services to be provided hereunder. This agreement supersedes all prior agreements, proposals, representations, statements, or understandings, whether written or oral, con-

cerning such services or the rights and obligations relating thereto.

(*Id.* at ¶ 11).

The CTO also contemplated the possibility of a business downturn that could reduce the volume of network services that TIA might require. Thus, Paragraph 10 of the CTO (the "Business Downturn Clause") provided that the parties would cooperate to negotiate a suitable alternative.

> In the event of a business downturn beyond [TIA]'s control, a corporate divestiture, or a network optimization using other AT & T services, that reduces the volume of network services required by [TIA] with the result that [TIA] will be unable to meet its revenue and/or volume commitments under this Agreement (notwithstanding [TIA]'s best efforts to avoid such a shortfall), AT & T and [TIA] will cooperate in efforts to develop a mutually agreeable alternative to this Agreement that will satisfy the concerns of both parties and comply with all applicable legal and regulatory requirements. By way of example and not limitation, such alternative may include changes in rates, nonrecurring charges, revenue and/or volume commitments, discounts, the multi-year service period and other provisions. Subject to all applicable legal and regulatory requirements, including the requirements of the FCC and the Communications Act of 1934, AT & T will prepare and file any tariff revisions necessary to implement such mutually agreeable alternative . . . .

(CTO, at ¶ 10). In order to invoke the clause, TIA was to provide AT & T with "written notice of the conditions it believes will require the application of" the Business Downturn Clause. (*Id.*). In addition, the clause could not be triggered unless

---

**3.** As described by counsel during oral argument, a contract tariff order is an agreement pursuant to which AT & T agrees to file with the FCC a relevant contract tariff which describes the services to be provided by the

common carrier. (Tr. at pp. 9–10). Unlike a contract tariff, the contract tariff order does not need to be filed with the FCC and it is not considered to be part of the substantive terms of the filed contract tariff.

and until AT & T filed a new tariff with the FCC. The clause also provided that it did "not constitute a waiver of any charges, including shortfall charges, incurred by [TIA] prior to the time the parties mutually agree to amend or replace this Agreement." (*Id.*). The parties never did "develop a mutually agreeable alternative;" no new tariff was filed by AT & T; and the CTO and CT 1192 remained in effect without modification, and therein remained the only applicable tariff governing the relationship between TIA and AT & T.

On May 18, 1994, pursuant to the CTO, AT & T filed a contract tariff,[4] Contract Tariff No. 1192 ("CT 1192"), which provided a rate structure that was steeply discounted from AT & T's standard tariff rates for Domestic and International Megacom Service (the "Megacom Services") and Domestic and International Megacom 800 Service (the "Megacom 800 Services"). (AT & T 56.1, at ¶ 37). In return for the steep discount, TIA promised to purchase a large minimum annual volume of service (the "Minimum Volume Commitments"): 2,800,000 minutes of "inbound" Megacom 800 Service and 4,400,000 of "outbound" Megacom Service for year one, and 5,600,000 minutes and 8,800,000 minutes, respectively, for years two and three.[5] TIA agreed to pay AT & T shortfall charges of $.090 per minute for each minute it fell short of the Minimum Volume Commitment for the Megacom Services, and $1.00 per minute for each minute it fell short of the Minimum Volume Commitment for the Megacom 800 Services (the "Shortfall Charges"). (CT 1192, at § 3.A.).

CT 1192 incorporated by reference the terms and conditions for the generic tariffs corresponding to the Megacom Services, AT & T Tariff F.C.C. No. 1, and for the Megacom 800 Services, AT & T Tariff F.C.C. No. 2. (*Id.* at § 4). Moreover, CT 1192 also provided rate schedules detailing the discounted rates TIA would receive with regard to the Megacom and Megacom 800 Services. (*Id.* at §§ 4, 7).

Furthermore, TIA also purchased another service from AT & T for Diamond Net: ACCUNET T1.5 Access Connections (the "T1.5 Service"); AT & T Tariff F.C.C. No. 9 set forth the contract price for the T1.5 Service. (*Id.* at § 4). As described by counsel, the T1.5 Service provided crucial local service connecting the inbound call from AT & T's receiving switch to TIA's switch housed in Staten Island, thus linking the inbound and outbound calls. (Tr. at pp. 8–10). The term of service for the T1.5 Service was also three years.

Under the terms of CT 1192, TIA guaranteed AT & T minimum annual charges of $7,500,000 for the first year and $15,000,000 for the second and third years for these "inbound" and "outbound" services (the "Minimum Annual Charges"). (*Id.* at § 3.B.). All together,

4. A contract tariff sets out individually negotiated and tailored services arrangements between a common carrier and its customer. The contract tariff usually incorporates the terms of a common carrier's generic tariffs, like AT & T Tariff Nos. 1 and 2 here, and also includes specially negotiated terms, like minimum volume commitments and corresponding discounts and penalties. After the common carrier and the customer agree upon the terms, the contract tariff must be filed with the FCC and made available to any similarly situated customers. *See, Fax Telecomunicaciones Inc. v. AT & T,* 138 F.3d 479, 482 (2d Cir.1998); *National Communications Assoc., Inc. v. Amer. Tel. & Tel. Co.,* No. 92 Civ. 1735, 1998 WL 118174, *27 n. 31 (S.D.N.Y. Mar. 16, 1998); *Interstate Interexchange Marketplace,* 6 F.C.C.R. 5880 at ¶¶ 90–91 (1991) (FCC adopts policy permitting carriers to offer services pursuant to individually negotiated contracts); *on reconsideration,* 6 F.C.C.R. 7569 (1991), *on further reconsideration,* 7 F.C.C.R. 2677 (1992), *on further reconsideration,* 10 F.C.C.R. 4562 (1995).

5. The amount of the discount AT & T provides to a customer is directly related to the volume purchase made by the customer. Since AT & T provides the Megacom services pursuant to "standard rates" under AT & T Tariff Nos. 1 and 2, "discounts off the standard level of rates contained in those tariffs are given in proportion to term and volume commitments. A higher discount is justified when a customer commits to a higher volume level." (Richard March 4 Aff., at ¶¶ 14–15).

totaling the Minimum Volume Commitments and the Minimum Annual Charges, TIA made a commitment to purchase approximately $53,000,000.00 of volume from AT & T over the course of the three-year term. (Richard March 4 Aff., at ¶ 14).

The CTO and CT 1192 also provided for the event of TIA's discontinuation of services prior to the termination of the three-year term. TIA agreed that it could be assessed a termination charge, in the amount approximately of the entire shortfall from the Minimum Annual Charges if it discontinued service under CT 1192 prior to the expiration of the three-year term. (CT 1192, at § 6.E.). The Termination Charge for AT & T Megacom Services was to be 100% of the unsatisfied domestic Minimum Volume Commitment multiplied by $.090 per minute; and the Termination Charge for AT & T Megacom 800 Services was to be 100% of the unsatisfied international Minimum Volume Commitment multiplied by $1.00 per minute. (Id. at § 6.E.). If, however, TIA replaced those tariffed services with other AT & T services applicable to "Contract Tariffs or another Contract Tariff of equal or greater term, volume and revenue commitment," the Termination Charge imposed upon TIA was to be excused. (Id. at § 6.F.).

The terms of the various generic AT & T tariffs incorporated in CT 1192, AT & T Tariff Nos. 1, 2, and 9, all stated that payment for the services "is due upon presentation of the bill." (AT & T 56.1, at ¶ 54).

Finally, Paragraph Four of the CTO also made it clear that if any inconsistency arose between the terms of CT 1192, and the filed tariffs incorporated by reference therein, the terms of CT 1192 "shall prevail." (CTO, at ¶ 4). Moreover, Paragraph Four also stated that if any inconsistency arose between the terms of CT 1192

and the filed tariffs incorporated by reference therein, on the one hand, and the CTO on the other, the terms of CT 1192 "shall prevail." (Id.). Thus, the parties agreed that the terms of CT 1192 would trump all other terms and conditions governing the network services aspect of the relationship between TIA and AT & T, including the terms of the CTO.

### Equipment Problems and Efforts to Remedy Same

On June 16, 1994, the equipment and services comprising Diamond Net were activated. On September 23, 1994, TIA executed Commencement Certificates indicating that it had accepted the equipment provided by AT & T pursuant to the first Equipment Agreement.[6] Almost immediately after activation, however, TIA experienced performance problems with the capability of the equipment it had purchased: calls did not reach their destination; the clarity of connections was distorted by echoes and noises; and incoming and outgoing lines could not be synchronized properly. (TIA 56.1, at ¶ 15). AT & T installed monitoring equipment intended to report outages automatically, and the reports thus generated indicated frequent equipment and service problems. (Id. at ¶ 18). TIA advised AT & T frequently of the performance problems it experienced and complained that the equipment was inadequate for the Diamond Net application. (TIA 56.1, at ¶ 17).

AT & T convened a high-level task force to analyze and remedy TIA's complaints. Although the parties dispute its efforts and accomplishments, it appears that AT & T's engineers recognized that "the network/hardware configuration" sold to TIA did not allow "an end-to-end AT & T solution," that this presented a conflict with AT & T's "marketing offer" to TIA, and that no solution was apparent. (Joyce Aff.,

---

6. The Master Equipment Lease Agreement Commencement Certificates provide that:
all Equipment ... has been delivered and fully installed ... and Lessee irrevocably accepts that Equipment for all purposes of the Agreement, the Purchase Documents and all related documents.
(Affidavit of Michael White, dated July 31, 1997, Exhibit D).

at Ex. 37). In June 1995, one member of the AT & T task force wrote that in light of TIA's $53 million commitment to AT & T, it was "not the time to tell" TIA the system was "permissive . . . better to walk on egg-shells until we have an alternative?" (*Id.* at Ex. 22).[7] As another member of the AT & T task force commented, "how far should we go toward fixing the unfixable." (*Id.* at Ex. 20).

AT & T recommended that TIA purchase additional equipment, including another Conversant, an ASAI link, more software, and another year of maintenance, and expressed its view that these measures would remedy Diamond Net's performance problems. (TIA 56.1, at ¶¶ 23–27). Essentially, the theory behind the additional equipment was to provide a certain level of redundancy for back-up. (Affidavit of Douglas Lonergan, dated November 18, 1998, Ex. B). TIA agreed, and the parties entered into a second equipment purchase service agreement.

### The Equipment Purchase/Service Agreement of June 1995

On June 23, 1995, TIA executed the second Equipment Agreement providing for the purchase of the second Conversant, the ASAI link and other items of equipment. The terms of the Second Equipment Agreement were identical to the one executed in May 1994. (Kelly Aff., Ex. B). None of its provisions reflected on the frustrations that TIA had experienced or the view toward correction that AT & T had expressed. Indeed, as with the first Equipment Agreement, the terms disclaimed pre-contract promises and most warranties and representations. The single reflection of a possible problem was suggested by an amendment to the second Equipment Agreement providing that the equipment would be performance tested for "a period of ninety (90) days . . . to determine compliance with the following standard:"

The Product will consistently pass dialed numbers from your CONVERSANT to your DEFINITY G3R in one (1) second or less, provided the calls processed are limited to human voice calls, calls originating from a FAX machine or voice or FAX calls made via a speed dialing feature and no other applications than the Product are concurrently running on the CONVERSANT.

(*Id.*). Furthermore, the Amendment provided that it was applicable only to the products included on the Second Equipment Agreement, (*id.*), and that by the ninetieth day, TIA would either accept the product and "AT & T [would] remedy any non-conformities in accordance with the warranty provisions of the PURCHASE[ ] AGREEMENT," or TIA would notify AT & T in writing that it was rejecting the additional equipment. (*Id.*).

AT & T delivered and installed the additional equipment and, after the 90–day period of warranty expired, TIA accepted the additional equipment. In January 1996, in connection with its acceptance, TIA executed another Commencement Certificate, identical to the earlier Commencement Certificate, documenting its unequivocal acceptance of the additional equipment. (Affidavit of George McLachlan, dated Jan. 9, 1999, Ex. C). Furthermore, TIA entered into another MELA with AT & T Credit to finance the purchase of the additional equipment. The adjusted purchase price of the equipment purchased pursuant to the second MELA totaled $452,000.84.

### Negotiations Concerning the Shortfall Charges and Invocation of the Business Downturn Clause

During the summer of 1995, TIA recognized that it could not meet the Minimum Volume Commitments established for the first year of CT 1192. AT & T advised TIA that in order to invoke the Business Downturn Clause, certain measures need-

---

7. A "permissive" service, as AT & T used the term, connoted a service whose performance could not be guaranteed.

ed to be implemented, including the transmittal of an "official" letter from TIA. (TIA 56.1, Ex. 28). But, no "official" letter from TIA to AT & T was ever transmitted; no amendment or agreement was made; and no new contract tariff was filed. Despite TIA's intention to invoke the Business Downturn Clause and enter into negotiations with AT &. T in the manner provided by the CTO, an agreement was never reached.

### TIA's Balance Due for the Network Services

On December 23, 1996 and December 24, 1996, respectively, TIA gave notice to AT & T to terminate the Megacom 800 Services and the Megacom Services and soon thereafter disclaimed its payment obligations to AT & T Credit under the MELAs. (AT & T 56.1, at ¶¶ 51–52). By that time, TIA had incurred significant balances due to AT & T: $802,445.43 for the Megacom 800 Services;[8] and $36,915.19 for the T1.5 Services.[9] AT & T alleges that these amounts are still outstanding presently. In addition, AT & T contends TIA owes AT & T the Shortfall Charges due under CT 1192: $21,659,516.08 for the Megacom Shortfall Charges and $36,370,376.66 for the Megacom 800 Shortfall Charges. (AT & T 56.1, at ¶¶ 76–77). Thus, AT & T contends that TIA owes AT & T $58,869,253.36 pursuant to the tariff agreements. AT & T also contends that TIA owes it $47,727.07 in back post-warranty maintenance and termination bills for repair and maintenance services provided to TIA after the end of the one-year warranty period.[10]

### TIA's Lawsuit

TIA filed suit against AT & T in early February 1996, almost eleven months prior to its termination notice to AT & T. TIA's Second Amended Complaint alleges thirteen claims for relief, including fraudulent inducement, breach of contract and related contract and quasi-contract claims for relief, violations of the Federal Communications Act, and unfair competition under federal and state common law.

TIA alleges that it entered into an "overarching" agreement with AT & T, pursuant to which AT & T agreed to design, implement and maintain Diamond Net as an "end-to-end" service. Moreover, TIA contends that AT & T breached numerous representations and warranties with respect to the performance of Diamond Net, and that AT & T fraudulently induced it to enter into the several constituent agreements: the Equipment Agreements, the CTO and contract tariff CT 1192.

Thus, the Second Amended Complaint includes a claim for fraudulent inducement of contract and alleges breach of the "overarching" agreement, the two Equipment Agreements, the CTO and contract tariff CT 1192 (First and Second Claims for Relief, respectively). TIA's Third Claim for Relief alleges that AT & T breached its duty of good faith and fair dealing, and its Fourth Claim for Relief alleges that AT & T breached certain express warranties with respect to the "overarching" agreement for "end-to-end" service. The Fifth Claim for Relief, based on a theory of "money had and received," alleges that AT & T received substantial sums of money for the design, implementation and maintenance of Diamond Net and that it failed to provide a properly functioning system. TIA's Sixth and Seventh Claims for relief seek damages and rescission of the agreements between the parties under theories of unilateral and mutual mistake, respectively. The Eighth Claim for Relief, based on promissory estoppel, claims

---

8. This net balance reflects the sum left over from a total bill in the amount of $955,624.68 less TIA's payment of $153,179.25. (AT & T 56.1, at ¶¶ 58–60).

9. This net balance reflects the sum left over from a total bill in the amount of $48,930.67 less TIA's payment of $7,206.14 less a credit of $4,809.34. (AT & T 56.1, at ¶¶ 61–65).

10. This net balance reflects the sum left over from a total bill of $50,024.31 less a credit in the amount of $2,297.24. (AT & T 56.1, at ¶¶ 103–112).

that AT & T promised to design and implement Diamond Net and also promised not to enforce the Shortfall Charges, and that TIA relied to its detriment upon those promises. TIA's Ninth Claim of Relief, asserting negligent misrepresentation and concealment, alleges that AT & T's representations with respect to the performance of Diamond Net were made negligently and that AT & T purposely concealed the conclusions of the task force created by AT & T to investigate the performance problems with Diamond Net.

In its Tenth, Eleventh and Twelfth Claims for Relief, TIA alleges that AT & T violated Sections 201–203 of the Communications Act. Specifically, TIA contends that AT & T violated Sections 201 and 202 by unjustly discriminating against TIA by providing it with less favorable charges and poorer service than those provided to non-reseller customers and to AT & T itself (Tenth Claim for Relief). Furthermore, TIA asserts that AT & T violated Sections 201–203 by unreasonably delaying and mishandling the provision of services to TIA, by providing TIA with untimely and inaccurate bills, by misusing TIA's customer proprietary network information and by using TIA as a test "beta" enabling AT & T to design, improve and implement its own call-turnaround service for the Japanese Market (Eleventh Claim for Relief).

TIA's Twelfth Claim for Relief alleges that AT & T purposely withheld the conclusions of AT & T's task force, convened specifically to study Diamond Net's performance problems, that AT & T fraudulently induced it to purchase more equipment, pursuant to the second Equipment Agreement, and that AT & T's actions with respect to TIA were "unjust and unreasonable," and violated its "duty of non-discrimination" in violation of Sections 201 through 203 of the Communications Act (Twelfth Claim for Relief). Finally, TIA also alleges that AT & T's conduct constitutes unfair competition under state and federal common law (Thirteenth Claim for

Relief). In total, TIA seeks in excess of $187 million in damages, costs and attorneys' fees in prosecuting this action, and any other relief the Court deems just and proper.

AT & T denied the allegations in the Second Amended Complaint and asserted four counterclaims against TIA and its parent company, Telecom International, alleging: the balance due for Megacom 800 charges, in the amount of $802,445.43 (First Counterclaim); that TIA failed to reach the minimum volume commitments for both Megacom and Megacom 800 services, and, consequently, TIA owes AT & T Shortfall Charges in the amount of $58,-029,892.74 (Second Counterclaim); that TIA failed to pay monthly bills for its T1.5 Service usage during Diamond Net's existence, in the amount of $36,915.19 (Third Counterclaim); and that TIA has failed to pay for post-warranty maintenance, in the amount of $47,727.07 (Fourth Counterclaim). In total, AT & T seeks damages in the amount of $58,916,980.43, plus pre- and post-judgment interest, costs and attorneys' fees.

AT & T Credit intervened and filed claims against TIA claiming the amount due under the terms of the two MELAs, totaling approximately $645,580.30 (minus $103,077.22 received by AT & T Credit as proceeds for the sale of the recovered equipment, for net damages of $542,-503.08.). On March 18, 1999, I granted summary judgment in favor of AT & T Credit on the basis that TIA's acceptance of the equipment and the terms and conditions of the MELAs created an irrevocable obligation on the part of TIA to pay the full amount financed. Subsequently, by Amended Memorandum and Order, dated June 10, 1999, I certified that judgment as final pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

In response to AT & T Credit's lawsuit, TIA initiated a "fourth-party" action against AT & T for fraudulently inducing it to enter into the MELAs claiming that AT & T should pay any damage award to

which AT & T Credit may be entitled. TIA's Fourth–Party action is not involved in AT & T's motion.

After two oral arguments and several meetings with the parties, I now grant in part and deny in part AT & T's motion for partial summary judgment.

### THE RELEVANT LAW AND ANALYSIS

**A. The Law Concerning Summary Judgment**

The standard for granting summary judgment is well established. The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (*"Celotex"*). Summary judgment may be granted if the pleadings and written discovery, together with the affidavits, show that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c) (1999); *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Gallo v. Prudential Residential Servs. Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994) (*"Gallo"*). The trial court's task at the summary judgment motion stage is to discern if there are genuine issues of material fact to be tried, not to deciding them; its duty is "issue-finding," it does not extend to "issue-resolution." *Gallo,* 22 F.3d at 1224.

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (*"Matsushita"*). If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.

R.Civ.P. 56(e) (1999). The nonmoving party must raise more than just a "metaphysical doubt" as to the material facts. *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If there is an absence of sufficient proof as to any essential element on which the opponent of summary judgment has the burden of proof, any factual dispute with respect to other elements becomes immaterial and cannot defeat the motion. *Gottlieb v. Co. of Orange,* 84 F.3d 511, 519 (2d Cir.1996) (*"Gottlieb"*). Speculative and conclusory allegations by the non-movant are insufficient to prevent a summary judgment motion from being granted. *Allen v. Coughlin,* 64 F.3d 77, 80 (2d Cir.1995) (*"Allen"*).

### I. TIA'S SECOND AMENDED COMPLAINT

At its core, this matter concerns the scope of the rights and obligations to which these parties contracted. Resolution of this issue provides the foundation upon which the other claims can be assessed. Thus, I will treat TIA's allegations of breach of contract first.

**A. Breach of Contract and Breach of Express Warranty**

TIA's Second Amended Complaint alleges that AT & T breached an "overarching" agreement pursuant to which AT & T would design, manufacture and implement Diamond Net as an "end-to-end" long-distance telephone service. (Second Amended Compl., at ¶¶ 197–214). According to TIA, this "overarching" agreement was implemented by a number of oral representations and three written agreements, namely the CTO and the two Equipment Agreements,[11] and that AT & T breached these agreements as well.

---

11. The CTO incorporates by reference the terms of CT 1192, the contract tariff governing the parties' network service obligations.

I hold that the parties' rights and obligations are to be determined by examining the terms and conditions of the three written agreements executed by AT & T and TIA, and the tariff filed by AT & T thereunder. I hold that no "overarching" agreement for "end-to-end" service existed between the parties, and that such an "overarching" agreement contradicts the unambiguous terms of the three executed integrated agreements, and is specifically disclaimed by them. New Jersey law, the governing law stipulated by the written agreements, makes this clear.

In New Jersey, as its Supreme Court has held, "no principle is more firmly imbedded in our law than that which declares that in the absence of fraud or illegality [ ], where a written agreement is complete on its face, oral testimony will not be permitted either to contradict it, or to supply terms with respect to which the writing is silent." *Schlossman's, Inc. v. Radcliffe,* 3 N.J. 430, 435, 70 A.2d 493 (1950) (*"Schlossman's"*). Where a writing purports to be complete on its face, the writing must be accepted as the full expression of the agreement of the parties; parol evidence is not allowed. *Filmlife, Inc. v. Mal "Z" Ena, Inc.,* 251 N.J.Super. 570, 573, 598 A.2d 1234 (App.Div.1991) (*"Filmlife"*). Consequently, an oral warranty or representation made prior to or contemporaneously with the writing will not be admitted to add or vary a writing, nor will a warranty be implied therein, where the contract by its very terms is made the "'entire agreement', between the parties." *Schlossman's,* 3 N.J. at 435, 70 A.2d 493. The parol evidence rule in New Jersey is "unusually rigid," as the Study Comment to Section 12A:2–316 of the New Jersey Statutes observes, and "has been used on a number of occasions to prevent proof of warranties." N.J. Stat. Ann. § 12A:2–316 cmt. 5 (1999); *see also,* N.J. Stat. Ann. § 12A:2–202 (1999) (New Jersey's Parol Evidence Rule). Thus, contracts with unequivocal integration and merger clauses are accorded "conclusive effect in determining whether the contract is integrat-

ed." *Dow Chem. Co. v. Schaefer Salt & Chem. Co.,* No. 91–4027, 1992 WL 672289, at *9 (D.N.J. July 21, 1992); *Silverstein v. Keane,* 19 N.J. 1, 115 A.2d 1 (1955); *Ross v. Orr,* 3 N.J. 277, 69 A.2d 730 (1949) (*"Ross"*); *see also,* N.J. Stat. Ann. 12A:2–202 cmt. (1999).

### 1. *The "Overarching" Agreement*

■ TIA seeks what the parol evidence rule prevents—to alter or modify the specific terms of complete, integrated agreements with evidence of alleged prior communications between the parties. *Schlossman's,* 3 N.J. at 435, 70 A.2d 493; *Filmlife,* 251 N.J.Super. at 573, 598 A.2d 1234. New Jersey law precludes such a result. Where a written agreement provides that it is the entire agreement between the parties, evidence of oral representations will not be admitted to vary the terms of the written agreement or to create a new agreement between the parties. *Schlossman's,* 3 N.J. at 435, 70 A.2d 493; *Filmlife,* 251 N.J.Super. at 573, 598 A.2d 1234.

■ TIA contends that an "overarching" agreement can be inferred from representations made by AT & T personnel in pre-contract meetings, and in meetings seeking to remedy Diamond Net's performance problems. But there is no mention of a commitment by AT & T to provide "end-to-end" service in any written agreement. Thus, the written agreements specifically provide that any such "prior agreements, proposals [and] communications" are superseded.

This is the entire agreement between the parties with respect to the products to be provided hereunder and supersedes all prior agreements, proposals, communications, between the parties and understandings, whether written or oral.

(Equipment Agreement, at § 22(H), *see also,* similar provision in CTO, at ¶ 11). New Jersey law, gives such integration

and merger provisions conclusive effect. *Ross*, 3 N.J. at 277, 69 A.2d 730.

The Equipment Agreements and the CTO also expressly disclaim any but standard warranties.

> Except for any warranties expressly made in the [CT 1192] or the applicable tariffs, AT & T excludes all warranties, express or implied, including but not limited to any implied warranties or merchantability and fitness for a particular purpose....

(CTO, at ¶ 5; *see also*, similar provision in Equipment Agreement, at § 8A). Specifically, warranties of "merchantability or fitness for a particular purpose" are disclaimed. (Equipment Agreement, at § 8(A)). TIA's understanding of these disclaimers is presumed. *Fleming Cos. Inc. v. Thriftway Medford Lakes, Inc.*, 913 F.Supp. 837, 843 (D.N.J.1995) ("*Fleming Cos. Inc.*"); *Fivey v. Pennsylvania R.R. Co.*, 67 N.J.L. 627, 632, 52 A. 472 (E. & A.1902). Moreover, the agreements are bereft of any description of how the tariffed services would work together, nor are there any representations concerning the quality of transmission. TIA is presumed to have understood the absence of such terms.

These contracts are written for business people. Officers and employees of companies must be able to read and understand the rights and obligations of the parties from the terms and conditions of complete, integrated contracts. *See, e.g., Brinderson–Newberg Joint Venture v. Pacific Erectors, Inc.*, 971 F.2d 272, 281 (9th Cir. 1992) ("*Brinderson*"). The stability of contract obligations and the objective understanding and expectations of the parties cannot be undermined by judicial sympathy to one party or the other, or the

unwillingness to apply that which is clearly written. *Fleming Cos. Inc.*, 913 F.Supp. at 843. Here, the Equipment Agreements and the CTO are clear and nowhere do they obligate AT & T to provide "end-to-end" service or equipment fit for any represented function.

TIA further argues that the executed agreements are ambiguous as to the full breadth of the rights and obligations of the parties and asks me to entertain parol evidence.[12] *Garden State Buildings, L.P. v. First Fidelity Bank, N.A.*, 305 N.J.Super. 510, 702 A.2d 1315 (App.Div.1997) ("*Garden State Buildings*"); *Kronisch v. The Howard Savings Institution*, 154 N.J.Super. 576, 382 A.2d 64, *aff'd in part, rev'd in part*, 161 N.J.Super. 592, 392 A.2d 178 (App.Div.1978) ("*Kronisch*"). TIA's argument is without merit. An absence of terms does not create ambiguity. The Equipment Agreements are form contracts and the CTO is a one page agreement with twelve straightforward provisions. There are no ambiguities. TIA fails to identify any language in either the Equipment Agreements or the CTO which is susceptible to at least two fairly reasonable meanings. *Garden State Buildings*, 305 N.J.Super. at 525, 702 A.2d 1315. We do not have an "unartfully drawn [assignment] provision clearly ... subject to more than one interpretation," *see, Garden State Buildings*, 305 N.J.Super. at 525, 702 A.2d 1315, or a reference to a conveyance "in trust" that was susceptible to multiple interpretations, *see, Kronisch*, 154 N.J.Super. at 586, 382 A.2d 64. Here, TIA has not pointed to, and cannot point to, any provision of the Equipment Agreements or the CTO which is ambiguous, and consequently, its claim for breach of an "overarching" agreement must fail.[13]

---

12. The New Jersey Supreme Court has ruled that construction of a written agreement is a matter for the court. *Fitzmaurice v. Van Vlaanderen Machine Co.*, 57 N.J. 447, 449, 273 A.2d 561 (1971); *Michaels v. Brookchester, Inc.*, 26 N.J. 379, 387, 140 A.2d 199 (1958).

13. Furthermore, as will become clear *infra*, TIA's breach of contract claims with respect to the CTO and CT 1192 are also barred by the filed rate doctrine. *See, American Tel. & Tel. Co. v. Central Office Telephone*, 524 U.S. 214, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998).

In sum, TIA's Second and Fourth Claim for Relief alleging breach of an "overarching" agreement and express warranties are dismissed with prejudice because the integrated agreements executed by the parties are bereft of any provisions memorializing an agreement for "end-to-end" service; the parol evidence rule bars introduction of any evidence specifically contradicting the terms of those agreements.

### 2. *Breach of AT & T's Standard Specifications with Respect to the Equipment Agreements*

■ TIA's Second Claim for Relief also alleges, as extended during oral argument and elaborated by supplemental submissions from the parties, that the equipment and software it purchased failed to perform in accordance with AT & T's standard specifications, a warranty that is specifically provided by the written agreements. (Equipment Agreement, at § 6). I hold that these allegations give rise to triable issues of fact and, therefore, I deny AT & T's motion for summary judgment with respect to the Second Claim for Relief. I also deny TIA's request for further discovery.

TIA's telecommunications consultant identified numerous standard specifications that AT & T breached, proximately causing the equipment failures that allegedly compromised TIA's ability to deliver satisfactory Diamond Net performance to its customers. (Supplemental Affidavit of Douglas Lonergan, dated May 5, 1999 ("Lonergan Supp. Aff."), at ¶¶ 5–6). Specifically, TIA's expert identified breaches of standard specifications relating to, among other items of equipment:

a. Problems with the G3r Conversant, including failure on a trunk to trunk transfer, during which TIA's G3r "does not always pass supervision."

(Lonergan Supp. Aff., at ¶ 35, Ex. 21).

b. The G3r Conversant, when acting in "tandem" failed to consistently perform in accordance with the standard specifications listed for the Definity Generic 3 Glossary Issue 2, March 1994. (*Id.* at ¶ 36, Ex. 23).

c. The "Blind Transfer" function consistently failed: the function which dials the "third party number" starts the transfer and then "relinquishes the call to either a busy signal, no answer or whatever the condition may be." (*Id.* at ¶ 42, Ex. 31).

d. Problems with the remote maintenance on the Conversant which allowed a "technician or remote system administrator . . . to log into the system through the Remote Maintenance board over analog T/R lines to observe or administer the platform." (*Id.* at ¶ 43, Ex. 32).

e. AT & T failed to provide sufficient memory for the Conversant, providing only 26 megabytes of RAM rather than the 32 megabytes recommended by the Conversant's manual. (*Id.* at ¶ 41).

In addition, TIA contends that AT & T failed to deliver standard specifications for a considerable number of items of equipment where alleged failures to perform also proximately caused TIA's inability to provide satisfactory performance to its customers. Specifically, TIA asserts that it did not receive standard specifications for the Tapestry Comp. A and the ASAI Call Flow, two "items which were to drive TIA's application," and it did not receive standard specifications for the "Load Balancing/Call Allocator." [14] (Lonergan Supp. Aff., at ¶ 3 n. 1, ¶ 44). TIA contends that, in the absence of standard specifications for this equipment, it could reasonably have expected performance in accordance

---

14. During discovery, AT & T produced over 5,000 pages of standard specifications for the equipment purchased by TIA. As Mr. Lonergan states in his supplemental affidavit, those documents do not "cover all the items listed in the [Equipment Agreements]." (*Id.* at ¶ 3 n. 1).

with AT & T's representations, notwithstanding the disclaimers of warranty in the Equipment Agreements.

AT & T counters TIA's claims that many of the "standard specifications" identified by TIA and the "missing" standard specifications were for "customized application[s] designed especially for TIA," not generic products. (AT & T Supplemental Memoranda, dated May 6, 1999, at p. 3). AT & T thus implies that no warranties governed the performance of these items of equipment, but that does not make sense in light of the explicit provision in the Equipment Agreement regarding the standard specifications. AT & T also takes issue with TIA's claims of equipment failure, arguing that there was only a "single incident of failure" concerning the remote maintenance functions, not the repeated failures as described by TIA, and that TIA is comparing the wrong kinds of memory with respect to the Conversant's memory capacity.

It is not the function of the court to weigh these conflicting claims. I find that genuine issues of triable fact exist. I cannot determine from the submissions of the parties whether the equipment and conforming software provided to TIA were specific to Diamond Net, separately or in configuration, or a collection of "off-the-shelf" products. I believe, also, that each item of equipment sold by AT & T had to perform according to a standard; that the reasonable expectations of a promisee would look to the standard specifications as the definitions of the governing standards; and that, in the absence of standard specifications, the parties' reasonable expectations should allow proofs of alternatives utilized by the parties, that is, their representations to one another. Finally, neither TIA's assertions of breach, nor AT & T's denial of breach, can be accepted. Proofs at a trial are required.

In anticipation of this finding, I ordered that the Plaintiffs should submit their Expert Report with respect to the alleged breaches of standard specifications by Friday, August 6, 1999, and that AT & T shall have an opportunity to submit their own expert report by Friday, September 3, 1999. I ordered trial to commence on Monday, October 11, 1999, with respect to this issue.

**B. _TIA's Other Contract–Related Claims for Relief_**

TIA has also asserted a number of claims for relief which are variations of its breach of contract claims. As I discuss, these claims are attempts to evade the preclusive effect of unambiguous and integrated written agreements which specifically disclaim the terms TIA seeks to impose upon AT & T. I will treat each of these claims for relief in turn.

**1. _Promissory Estoppel and Money Had and Received_**

■ TIA's Fifth and Eighth Claims for Relief are based on the principles of "money had and received" and promissory estoppel, respectively. In short, TIA claims that it paid AT & T large sums of money to design, implement and maintain Diamond Net, and that it received in return a system that did not function properly. TIA relied to its detriment upon AT & T's promises of "end-to-end" service, and under principles of "equity and good conscience," TIA alleges that AT & T should return all money paid to it by TIA, plus damages. AT & T, in response, argues that where there is a written enforceable agreement governing the relationship between the parties, a claim based in promissory estoppel, or "money had and received," cannot be sustained.[15] I agree.

---

15. AT & T contends, and TIA does not dispute, that New York law governs any claims based on promissory estoppel, despite the clause in the Equipment Agreements providing for construction in accordance with New Jersey law. _NCC Sunday Inserts, Inc. v._ _World Color Press, Inc._, 759 F.Supp. 1004 (S.D.N.Y.1991). Although New York appears to be the state with the most significant contacts, the choice of law clause in the Equip-

The New York State Court of Appeals has held repeatedly that the existence of a "valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987) (*"Clark–Fitzpatrick"*); *Blanchard v. Blanchard,* 201 N.Y. 134, 138, 94 N.E. 630 (1911); *Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.,* 723 F.Supp. 976, 993 (S.D.N.Y.1989) ("Faced with a comprehensive contract ... authorizing Federated's conduct, the Plaintiffs cannot invoke promissory estoppel to avoid its enforcement"). Indeed, such remedies only apply "in the absence of an express agreement;" for the remedy is not "really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment." *Clark–Fitzpatrick,* 70 N.Y.2d at 388, 521 N.Y.S.2d 653, 516 N.E.2d 190. New Jersey law is the same. *See, Ballard v. Schoenberg,* 224 N.J.Super. 661, 666, 541 A.2d 258 (App.Div.) ("Promissory estoppel is ... not itself a cause of action ex contractu ..."), *cert. denied,* 113 N.J. 367, 550 A.2d 473 (1988).

Here, the parties executed three valid and enforceable agreements defining explicitly the relationship between AT & T and TIA: the two Equipment Agreements, and the CTO, which incorporates the terms of CT 1192. The terms of those contracts exclude specifically the existence of an "overarching" agreement between the parties for "end-to-end" AT & T service, and it is not proper to create such an agreement based on the principles of promissory estoppel or "money had and received." *Callahan v. American Motorists Ins. Co.,* 56 Misc.2d 734, 737, 289 N.Y.S.2d 1005, 1009 (N.Y.Sup.Ct.1968) (Estoppel "will not ... serve to extend the coverage afforded by American's policy beyond what it contracted for"). The doc-

trines of promissory estoppel, money had and received and other such quasi contract remedies cannot defeat a properly drawn integration clause in a contract which specifically disclaims such representations and warranties. *NCC Sunday Inserts, Inc. v. World Color Press, Inc.,* 759 F.Supp. 1004, 1012 n. 13 (S.D.N.Y.1991); *see also, Levitt Homes Inc. v. Old Farm Homeowner's Assoc.,* 111 Ill.App.3d 300, 315, 67 Ill.Dec. 155, 444 N.E.2d 194 (2d Dist.1982). Accordingly, TIA's Fifth and Eighth Claims for Relief based on "money had and received" and promissory estoppel, are dismissed with prejudice.

### 2. *Breach of the Duty of Good Faith and Fair Dealing*

TIA's Third Claim for Relief alleges that AT & T breached its duty of good faith and fair dealing because of its failure to perform pursuant to its "contractual obligations." (Second Amended Compl., at ¶¶ 225–231). Specifically, TIA asserts that AT & T breached its duty of good faith and fair dealing because they failed to perform the "overarching" agreement, misrepresented and concealed the true nature of AT & T's ability to provide "end-to-end" service, and failed to implement the Business Downturn Clause. (*Id.* at ¶¶ 31–39; 228–29). AT & T argues that TIA attempts to impose upon AT & T a contractual obligation for "end-to-end" service conspicuously absent from the CTO, CT 1192 and the two Equipment Agreements.

■ New Jersey common law and N.J.S.A. 12A:1–201(19) impose upon parties the obligation to exercise good faith in the performance of a contract for the sale of goods. *Coast Cities Truck Sales, Inc. v. Navistar International Transportation Co.,* 912 F.Supp. 747, 776 (D.N.J.1995). The duty of good faith does not, however, alter the terms of a written agreement. *Rudbart v. North Jersey District Water*

ment Agreements may point to New Jersey, as the state whose policies on commercial dealing between parties are most affected. However, New York and New Jersey law concerning promissory estoppel are similar, and thus, I need not choose between them.

*Supply Comm'n,* 127 N.J. 344, 366, 605 A.2d 681, *cert. denied,* 506 U.S. 871, 113 S.Ct. 203, 121 L.Ed.2d 145 (1992) (*"Rudbart"*).

Since, the implied duty of good faith and fair dealing cannot be utilized to alter or add to the terms of the various written agreements executed by the parties, TIA may not use the duty to imply the existence of an "overarching" agreement for "end-to-end" service. *Rudbart,* 127 N.J. at 366, 605 A.2d 681. TIA's attempt to do so is an evasion of the obligations of contract, and cannot alter or nullify the explicit terms of the CTO and the Equipment Agreements. Consequently, AT & T is entitled to summary judgment dismissing TIA's Third Claim for Relief with prejudice.

### 3. *Fraudulent Inducement and Negligent Misrepresentation*

In Claims for Relief One and Nine, TIA claims that AT & T fraudulently induced it to enter into the "contract for and implementation of Diamond Net," and that AT & T made numerous "negligent misrepresentations:" specifically, concerning "end-to-end service/ONE BELL SYSTEM," Minimum Volume Commitments and the enforcement of Shortfall Charges, and withholding the task force's conclusions that the performance of Diamond Net could not be guaranteed. (Second Amended Compl., at ¶¶ 197–214, 265–71). Again, these allegations are but essentially repetitions of TIA's breach of contract claims that I have already dismissed.

■■ In New York,[16] "it is well settled that 'mere allegations of breach of contract do not give rise to a claim for fraud or fraudulent inducement....' " *Rolls-Royce Motor Cars, Inc. v. Schudroff,* 929 F.Supp. 117, 123 (S.D.N.Y.1996) (*"Rolls-Royce"*); *Deerfield Communications Corp. v. Chesebrough–Ponds, Inc.,* 68 N.Y.2d 954, 956, 510 N.Y.S.2d 88, 89, 502 N.E.2d 1003 (1986) (*"Deerfield"*). Most courts who have analyzed this question have refused to permit fraud claims arising from contractual relationships unless: (1) the claims are premised on a "a separate duty outside the [contract]" or (2) the plaintiff seeks to recover "special damages proximately caused by the alleged false representations that are not recoverable under the contract measure of damages." *Best Western Int'l, Inc. v. CSI International Corp.,* No. 94 Civ. 360, 1994 WL 465905, at *5 (S.D.N.Y. Aug. 23, 1994); *see also, Sudul v. Computer Outsourcing Servs.,* 868 F.Supp. 59, 62–63 (S.D.N.Y. 1994).

Here, TIA's allegations of damage from the fraud arise from the same allegations of their breach of contract claims: AT & T misrepresented their ability to provide "end-to-end" service to TIA; AT & T misrepresented whether they would enforce the Shortfall Charges; AT & T misrepresented that the system would function properly; and because of AT & T's alleged misrepresentations Diamond Net failed to achieve the success envisioned by TIA. Indeed, TIA's claims seek to enforce no more than the breached promises and obligations alleged in the breach of contract claims. *Bell Sports, Inc. v. System Software Assocs., Inc.,* 45 F.Supp.2d 220, 227 (E.D.N.Y.1999). Consequently, since

---

**16.** Under New York conflicts of law principles, fraud claims are generally governed by the laws of the jurisdiction where the injury is deemed to have occurred, "which is usually where the plaintiff is located." *Pinnacle Oil Co. v. Triumph Oklahoma Limited Partnership,* No. 93 Civ. 3434, 1997 WL 362224, at *2 (S.D.N.Y. June 27, 1997). Since the conduct which allegedly caused TIA's injury occurred in New York, and TIA suffered its alleged injuries in New York, and since New York contacts seem to be the most applicable, New York law would seem to govern. *See, e.g., Hamilton v. Accu–Tek,* No. 95 Civ. 0049, 1999 WL 167672, at *9 (E.D.N.Y. Jan. 22, 1999); *Rubel v. Eli Lilly & Co.,* 681 F.Supp. 151, 153 (S.D.N.Y.1987). However, these torts of fraudulent inducement and negligent representation affect written contracts governed by New Jersey law, suggesting that the law of that state may be implicated. Fortunately, as I commented in footnote 15, *supra,* the laws of the two states on this point seem to be similar.

TIA's fraudulent inducement and negligent misrepresentation claims are redundant of its breach of contract claims, those claims for relief must be dismissed. *Rolls–Royce,* 929 F.Supp. at 124.

TIA's reliance on *Deerfield* is unavailing. In *Deerfield,* the New York Court of Appeals held that the alleged fraudulent promise was independent of the buyer's duties to abide by the terms of the sales contract executed by the parties. *Deerfield,* 68 N.Y.2d at 956, 510 N.Y.S.2d 88, 502 N.E.2d 1003. Here, TIA points to no collateral fraudulent promise which it claims AT & T made to induce it to enter into the various agreements. Indeed, the only alleged promises TIA points to are those specifically disclaimed by the Equipment Agreements and the CTO, and which would contradict the express terms of those agreements. To allow parol evidence to contradict those specific terms would create an exception to the parol evidence rule which would defeat its very purpose. *See, e.g., Brinderson,* 971 F.2d at 280–81.

Moreover, TIA may not rest simply on its allegations in the Second Amended Complaint to survive summary judgment. TIA must come forward with facts. *Gottlieb,* 84 F.3d at 519; *Allen,* 64 F.3d at 80. TIA's papers are bereft of any facts demonstrating that the damages they are alleged to have suffered from the fraudulent inducement were caused by anything different from the facts alleged to support its claim for ·breach of an "overarching" agreement. *Dornberger v. Metropolitan*

*Life Ins. Co.,* 961 F.Supp. 506, 542 (S.D.N.Y.1997); *PI, Inc. v. Quality Prods., Inc.,* 907 F.Supp. 752, 761 (S.D.N.Y.1995). Nor has TIA identified any facts supporting the notion that AT & T never intended to honor its obligations and commitments when it entered into the CTO and the two Equipment Agreements. *Deerfield,* 68 N.Y.2d at 956, 510 N.Y.S.2d 88, 502 N.E.2d 1003; *Sabo v. Delman,* 3 N.Y.2d 155, 160, 164 N.Y.S.2d 714, 143 N.E.2d 906 (1957).

TIA's First and Ninth Claims for Relief alleging Fraudulent Inducement and Negligent Misrepresentation are dismissed with prejudice.[17]

### 4. *Mutual and Unilateral Mistake*

TIA further seeks to have the CTO and the Equipment Agreements rescinded based on the ground of mutual mistake: that both parties were operating under the mistaken impression that AT & T could provide "end-to-end" service (Seventh Claim for Relief). (Second Amended Compl., at ¶¶ 258–59). Alternatively, TIA contends it is entitled to damages based on unilateral mistake: AT & T made "mistaken representations"[18] which were material to TIA's decision to execute the various agreements (Sixth Claim for Relief). These claims suffer from the same infirmities as those mentioned above.

#### a. *Mutual Mistake*

▉ A mutual mistake occurs when both parties are under substantially the same erroneous belief as to a "particular,

---

**17.** TIA's Fraudulent Inducement and Negligent Misrepresentation claims based on the network services are also dismissed because the filed rate doctrine bars these claims. *American Tel. & Tel. v. Central Office Telephone,* 524 U.S. 214, 118 S.Ct. 1956, 1964, 141 L.Ed.2d 222 (1998).

**18.** These "mistaken representations" concern AT & T's experience in "designing, implementing" and provisioning applications similar to the architecture of Diamond Net (Second Amended Compl., at ¶¶ 31–39), and whether AT & T intended to enforce the

"Business Downturn Clause." (Second Amended Compl., at ¶¶ 59–63).

In its opposition to AT & T's motion for partial summary judgment, TIA modified its unilateral mistake claim to contend that TIA mistakenly believed that the application AT & T designed would work, that the two unrelated AT & T calls could be bridged by the AT & T equipment for clear, reliable transmissions. This is, again, an effort to be relieved of the contract it signed, not because it was mistaken as to what it signed, but because it wishes to be relieved of the legal consequence of the contract it signed.

essential fact." *Bonnco Petrol, Inc. v. Epstein*, 115 N.J. 599, 608, 560 A.2d 655, 659 (1989); *see also, Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 574–75, 498 N.Y.S.2d 344, 347–48, 489 N.E.2d 231 (1986); *Farnsworth on Contracts*, § 9.3 (2nd ed.1998).[19] Again, the doctrine of mutual mistake does not relieve the parties of the legal consequences of their signed agreements because they claim not to have been aware of those consequences. The objective intentions of the parties is determined by that which is signed, not that which they wish they would have signed.

In addition, TIA fails to elucidate any evidence demonstrating that AT & T maintained a belief that the contract it signed mistakenly provided something different than AT & T intended. Indeed, none of AT & T's deposition witnesses or affiants have stated that AT & T misunderstood the terms of the agreements it executed, or that the Equipment Agreements and the CTO contained provisions for the "end-to-end" service that TIA wishes to insert in them.

### b. *Unilateral Mistake*

■ With respect to unilateral mistake, courts in New Jersey have been loathe to rescind a contract based on unilateral mistake absent the existence of special circumstances.[20] None of those circumstances are present here. The alleged mistakes are nothing more than representations that TIA claims AT & T made during the pre-contract negotiation stage. The signed contracts did not incorporate those representations, and were specifically disclaimed by the contract. TIA may not introduce parol evidence of its supposed mistaken belief in an attempt to circumvent the preclusive effect of a properly drawn integration clause and an unambiguous agreement. Moreover, TIA cannot demonstrate that its reliance upon these alleged mistaken misrepresentations was reasonable, since it is charged with understanding and with knowing and accepting the terms of the contract it executed. *Fivey v. Pennsylvania R.R. Co.*, 67 N.J.L. 627, 52 A. 472 (E. & A.1902).

Since TIA does not raise a material genuine issue of material fact with respect to its Sixth and Seventh Claims for Relief alleging mutual and unilateral mistake, AT & T is entitled to judgment dismissing these claims with prejudice.

### C. *TIA's Claims for Relief Under the Communications Act*

TIA next asserts three claims for relief pursuant to the Communications Act, 47 U.S.C. § 151, *et. seq.* (1999). TIA's Tenth Claim for Relief alleges that AT & T violated Sections 201 and 202 of the Communications Act because AT & T "unjustly and unreasonably" discriminated against TIA by, among other things, providing TIA with less favorable charges, practices, classifications, regulations, facilities and services than those provided to AT & T's non-reseller customers, and that AT & T "intentionally subject[ed TIA] to undue and unreasonable practices, prejudices or disadvantage." (Second Amended Compl., at ¶ 273).

19. AT & T does not allege, but assumes, that New York law applies with respect to TIA's claims for relief alleging mistake. This belief, however, is erroneous. Any claim for mistake arises under the Equipment Agreements executed by the parties, which specifically provide for construction in accordance with New Jersey law. Once again, however, there is no material difference between New York and New Jersey law on this issue.

20. Specifically, these special circumstances have been described as: (1) the mistake must be of so great a consequence that to enforce the contract as actually made would be unconscionable; (2) the matter as to which the mistake was made must relate to a material feature of the contract; (3) the mistake must have occurred notwithstanding the exercise of reasonable care by the party making the mistake, and (4) the requested rescission cannot cause serious prejudice to the other party, except for loss of bargain. *Conduit & Foundation Corp. v. Atlantic City*, 2 N.J.Super. 433, 440, 64 A.2d 382, 385 (1949).

TIA's Eleventh Claim for Relief alleges that AT & T violated Sections 201–203 of the Communications Act, "and the contract obligations imposed on it by state and federal law, including the obligation of good faith and fair dealing, by, among other things, (i) unreasonably delaying and mishandling the provisioning[21] of [TIA]; (ii) providing untimely, inaccurate, and misleading billing to [TIA]; (iii) misusing [TIA's] proprietary customer information entrusted in confidence to AT & T[;] and [ ] (iv) conducting its relationship with [TIA] in a manner that AT & T knew, or should have known, would prevent [TIA] from fulfilling its tariff commitments." (Second Amended Compl., at ¶ 278). Although in its Second Amended Complaint, TIA identifies Section 203(c) as the statutory basis for its claims, TIA's brief shifts that basis to Sections 201 and 202.

TIA's Twelfth Claim for Relief alleges that the actions of AT & T described in Claims Ten and Eleven, constituted a refusal to provide service in violation of Section 201(a), unjust and unreasonable practices in violation of Section 201(b), discriminatory practices in violation of Section 202, and a violation of FCC orders and policies concerning resale charges. (*Id.* at ¶ 282). TIA alleges that AT & T's conduct described in the tenth through twelfth counts, was "willful, malicious, oppressive, and fraudulent, and undertaken with deliberate disregard for plaintiff's rights," and thus entitles TIA to "exemplary and punitive damages." (*Id.* at ¶¶ 275, 280, 284). I will discuss each of these three claims for relief in turn.

### 1. TIA's Tenth Claim for Relief: Discrimination Pursuant to Sections 201 and 202 of the Communications Act

█ TIA's Tenth Claim for Relief alleges unlawful discrimination pursuant to Section 202(a) of the Communications Act.

Section 202(a) of the Communications Act states:

(a) Charges, services, etc.

It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

47 U.S.C. § 202(a) (1999). Courts determining whether a carrier has unlawfully discriminated utilize a tripartite test analyzing: (1) whether the services are "like;" (2) if so, whether the carrier is offering the service to other customers at a "different" price or under "different" conditions than those offered to the petitioner; and (3) if such difference exists, whether that difference is unreasonable. *American Message Ctrs. v. F.C.C.*, 50 F.3d 35, 40 (D.C.Cir. 1995) (*"American Message Ctrs"*); *Competitive Telecommunications Ass'n v. F.C.C.*, 998 F.2d 1058, 1061 (D.C.Cir.1993) (*"Competitive Telecommunications"*).

█ AT & T contends that TIA cannot sustain a claim for unlawful discrimination because TIA admits that "no other reseller or subscriber receives services pursuant to Contract Tariff No. 1192." (*See,* TIA 56.1, at ¶ 75). The Second Amended Complaint further alleges, and therefore admits, that "TIA was AT & T's only customer which employed a two-leg calling system combining Megacom 800 Service inbound from Japan with Megacom service outbound" for the United States. (Second Amended Compl., at ¶ 160). Consequently, AT & T argues, TIA has no basis to complain under Section 202(a).

---

21. In the context of telecommunications, provisioning means the date upon which service is started or hooked up.

TIA argues AT & T's discrimination is shown not by comparing services under CT 1192 but under the subsumed tariffs for "inbound" and for "outbound" services, offered under AT & T's Tariffs F.C.C. Nos. 1 and 2. TIA argues that CT 1192 did not create new services; it simply established new prices for existing services. (TIA's Opp'n Brief, p. 22 n. 6). Second, TIA contends that the services AT & T provided to its "own call turnaround services to Japan were better than the services provided to [TIA]. The same tariffs, i.e., AT & T's Tariffs F.C.C. Nos. 1 and 2 were in use." (*Id.* at p. 22).

TIA's arguments are not supported by proof. TIA has failed to identify any other customer of services, either pursuant to CT 1192 or any of the individual tariffs incorporated by reference therein, who received better rates or quality of services for the same complement of services, than did TIA, either under CT 1192, or under the underlying generic tariffs incorporated therein, AT & T Tariffs Nos. 1 and 2. *See, e.g., American Message Ctrs.,* 50 F.3d at 40 (dismissal of petition for failure to identify any specific instance in which carrier treated another "like" customer differently than it treated petitioner). Similarly, TIA has failed to show that AT & T preferred itself to others.[22] To survive a summary judgment motion, TIA must set forth facts demonstrating that there is a genuine issue of material fact in dispute; it is insufficient for TIA merely to allege that AT & T provided "like" services to another customer or itself at preferential rates or superior quality. TIA makes no such showing. Without such a showing, TIA has failed to make a prima facie showing that complies with the second step of the *Competitive Telecommunications* inquiry, namely, that a carrier offered "like" services to other

customers at a "different" price or under "different" conditions than those offered to TIA. *Competitive Telecommunications,* 998 F.2d at 1061.

Accordingly, I dismiss TIA's Tenth Claim for Relief with prejudice.

### 2. *TIA's Eleventh Claim for Relief: Alleging Violations of Sections 201–203 for Unjust and Unreasonable Practices*

Section 201(b) of the Communications Act states, in pertinent part, that

> All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful ...

47 U.S.C. § 201(b) (1999). This omnibus statute provides for private rights of action by customers against carriers for a variety of different acts, including, among others: delays in provisioning of services to customers; and delays and improper billing practices, including the withholding of information concerning billing or the provision of misleading information concerning charges.

Section 203 of the Communications Act sets forth the framework for the public filing requirements that carriers must abide by in order to provide telecommunications services. Section 203(a) establishes that all carriers must file with the FCC schedules of its "charges for itself and its connecting carriers." *See,* 47 U.S.C. § 203(a) (1999). Section 203(b)(1) prevents any changes to schedules filed and published with the FCC, except after 120 days notice to the FCC and the public. *See,* 47 U.S.C. § 203(b)(1), (2) (1999). Sec-

---

**22.** I reject AT & T's argument that in light of the fact that AT & T does not "sell" services to itself it cannot be used as the standard by which to judge the quality of service. The FCC and courts have previously recognized that a telecommunications services provider can gain a competitive advantage by discrimi-

nating in favor of its own services. *See, e.g., California v. F.C.C.,* 39 F.3d 919 (9th Cir. 1994) (evaluation of FCC safeguards implemented to prevent, in part, Bell Operating Companies from "discriminating in favor of their own enhanced services in providing access to the telephone transmission facilities").

tion 203(c) provides that carriers shall collect only properly filed rates and, along with Section 203(a) shares the goal of preventing unreasonable and discriminatory charges. *See,* 47 U.S.C. § 203(c) (1999). Section 203(d) authorizes the FCC to reject any rate schedule which does not include "notice of its effective date;" Section 203(e) provides for penalties for violation of any part of Section 203. *See,* 47 U.S.C. §§ 203(d), (e) (1999).

 Although based on the record before me it does not appear that any of the acts taken by AT & T during the provision of services to TIA violate Section 203 of the Communications Act, there appear to be genuine issues of fact as to whether the bills AT & T provided TIA were accurate, thus potentially violating Section 201.[23]

### a. Misappropriation of Customer Proprietary Network Information

TIA alleges that, "unbeknownst to us, prior to th[e] initial meeting, AT & T was contemplating entering the Call–Turnaround market itself," and annexes documents received through third-parties indicating AT & T's intentions. (TIA 56.1, at ¶ 10). TIA alleges that it discovered that AT & T used TIA as a test "beta" for its own call-turnaround service, and used the technical information, known as customer proprietary network information ("CPNI"), learned from the provision of services for Diamond Net to improve upon AT & T's call-turnaround service. (*Id.* at ¶ 31). By October 1995, AT & T was offering a competing call-turnaround service to customers in Japan, using non-AT & T equipment in conjunction with AT & T long-distance services. (*Id.* at ¶¶ 28–29). According to TIA, AT & T's conduct and misappropriation of CPNI constitute violations of Section 201(b) of the Communica-

tions Act. In addition, TIA requests further discovery on this issue.

In opposition, AT & T argues that the alleged misappropriated "proprietary" information is not CPNI, but rather the "generic 'architecture'" of TIA's Diamond Net application, which AT & T rejected as the "architecture" for its own international call-turnaround product. Furthermore, AT & T contends that even assuming the information studied by AT & T constituted CPNI, in 1995, the time of the alleged misappropriation, AT & T violated no regulation in effect that restricted the use of CPNI by carriers.

Generally, CPNI is information generated by telecommunications providers during the course of the provision of services for each of its customers. The definition of CPNI, however, has evolved over time as the technology and the services provided by telecommunications companies has advanced.

During most of the period covered by the contracts between TIA and AT & T, CPNI was held to include "information about a telephone customer's use of the telephone network, such as the number of lines ordered, service location, type and class of service purchased, usage levels and calling patterns." *California v. F.C.C.*, 39 F.3d 919, 930 (9th Cir.1994).

Effective February 8, 1996, the amendment to the Communications Act came into effect. CPNI was then defined as:

(1) Customer proprietary network information

The term "customer proprietary network information" means—

(A) information that relates to the quantity, technical configuration, type, destination, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carri-

---

**23.** Any claim for violation of Section 202 is covered by TIA's Tenth Claim for Relief, which I have already dismissed with prejudice. Moreover, TIA has failed to identify another reseller or customer of AT & T, re-

ceiving "like" services, which AT & T treated differently with respect to billing practices and the provision of services. *American Message Ctrs.*, 50 F.3d 35.

er, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship; and

(B) information contained in the bills pertaining to telephone exchange service or telephone toll service received by a customer of a carrier;

except that such term does not include subscriber list information.

47 U.S.C. § 222(f) (1999).

CPNI is critical information for the customers, resellers (who are themselves customers and competitors of providers) and providers of telecommunications services. CPNI is useful to providers and resellers in their development and marketing of all types of services to customers because it allows the providers and resellers to identify potential customers, and to design more efficient services to meet their customer's specific needs. Consequently, based on their access to a specific customer's CPNI, a telecommunications service provider may achieve a competitive advantage over resellers or other providers in obtaining an end customer's business.

▇▇ Specifically, TIA identifies five categories of CPNI which it claims AT & T misappropriated:

a. Application analyses of the three components of the system including proprietary software and "scripts" developed by Tapestry specifically for TIA;

b. Billing information, including the name of the billing software provider, Commsys, and software related to bills;

c. Usage information, including a breakdown of calling patterns pre-

pared by AT & T (based on TIA information);

d. Equipment information, including the use of proprietary dialers developed by TIA and used by TIA's customers in Japan; and

e. Maintenance plans suggesting a single point of contact for trouble reports.

(Supplemental Affirmation of Aurora Cassirer in Opposition to Motion for Summary Judgment, dated, May 6, 1999, at ¶¶ 5–9). Based on the definition utilized by the Ninth Circuit in *California v. F.C.C., supra,* I find that much of the information TIA alleges that AT & T misappropriated did not constitute TIA's CPNI.[24] But, more importantly, TIA has come forward with no evidence to show that AT & T actually misappropriated and utilized TIA's CPNI. At summary judgment, it is insufficient to simply rely on conclusory allegations of wrongdoing. *Allen,* 64 F.3d at 80. TIA must come forward with facts demonstrating that AT & T "misappropriated" proprietary information from TIA and subsequently used that information in connection with the provision of their own international call-turnaround application. TIA has not satisfied its burden.

I grant AT & T summary judgment with respect to this portion of TIA's Eleventh Claim for Relief. I also deny TIA's request for further discovery with respect to this issue. This action is over three years old, and the parties have engaged in 18–months of discovery. When TIA filed its Second Amended Complaint, in August 1998, it represented to Judge Mukasey, to whom this matter was previously assigned, that it required no new discovery,[25] (TIA's

---

24. The Supreme Court has long recognized that "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). Thus, only those statutes and rules of the FCC effective as of the time of AT & T's alleged misappropriation apply.

25. In his order granting TIA's motion to amend, Judge Mukasey granted TIA further discovery only with respect to the third-party action filed against it by AT & T Credit. (Order, dated August 19, 1998). Judge Mukasey granted TIA no further discovery.

Amendment Brief, at p. 5), and TIA should be held to its representation.

### b. Delayed Billing and Other Billing Problems

TIA alleges that AT & T violated Section 201(b) of the Communications Act by, among other things, "... (ii) providing untimely, inaccurate, and misleading billing to plaintiff; ..." (Second Amended Compl., at ¶ 278). In particular, TIA sets forth evidence that the bills it received from AT & T were inaccurate with respect to the amount of usage of the respective AT & T services: unanswered calls were recorded as actual calls, causing other calls of short duration to be dropped from TIA's billing system (Joyce Aff., Ex. 64); AT & T's bills reflected significantly more Megacom completed calls (the second leg of the call-turnaround application) than Megacom 800 calls (the first leg of the call-turnaround application), a result that appears to be absurd (*id.* at ¶¶ 116, 117, and Exs. 64, 65); bills were rendered late, sometimes as late as eight months after the calls were made, making it difficult for TIA to collect from its customers (*id.* at ¶ 121); and there were other instances, relating to "dropped calls" (calls shorter than 18 seconds), and "extended calls," and mismatched calls (*id.* at ¶¶ 128, 129), all showing erroneous billing by AT & T.

In response, AT & T admits that bills were late, but contends that the number and amount were insignificant, that delays were inherent in the process and due to the many steps in the billing process, involving, in part, Japanese telephone intermediaries having control of the initial call made by TIA customers in Japan, and that the timeliness of the bills were ultimately remedied. (Reply Affidavit of Barbara Griffin, dated February 7, 1998, at ¶¶ 19, 20–21; Affidavit of Tom Olson, dated May 7, 1997, at ¶¶ 15–32; Ex. C–I (annexing

AT & T Bills for Megacom 800 and Megacom service from June 1996 to April 1997)). AT & T denies that billing delays caused any serious errors and, to the extent that they did, AT & T asserts that the errors were corrected. AT & T's argument, to a certain degree, is confirmed by TIA's inability to identify precise errors in the billing statements supplied by AT & T in its papers, and TIA's apparent unwillingness to accept the appointment of a neutral accountant's determination regarding the existence of any errors, and the amount, if any, of such errors. Moreover, AT & T argues that many of the problems TIA encountered with billing were due to how TIA chose to bill its customers, for which AT & T should not be responsible. (Reply Affidavit of William Quillen, dated February 4, 1998, at ¶ 9).

■ Thus, there is a triable issue: were AT & T's bills accurate, and if not, was TIA damaged? I hold with respect to TIA's Eleventh Claim for Relief that there are triable issues of fact as to billing delays suffered by TIA, whether the bills provided by AT & T reflect TIA's accurate actual usage of AT & T services, and what is TIA's damage therefrom? Therefore, AT & T's motion for summary judgment with respect to TIA's Eleventh Claim for Relief is denied.[26]

### 3. TIA's Twelfth Claim for Relief: Alleging Violation of Sections 201–203 of the Communications Act

■ TIA's Twelfth Claim for Relief recapitulates each of the allegations made with respect to its Tenth and Eleventh Claims for Relief, except it adds that the conduct alluded to in those Claims for Relief was "willful, malicious, oppressive, and fraudulent and undertaken with deliberate disregard for plaintiff's rights." (Second Amended Compl., at ¶ 284). This iteration adds nothing, nor is there a cause

---

**26.** TIA conclusorily alleges that AT & T "unreasonably delay[ed] and mishandl[ed] the provisioning" of Diamond Net, (*see,* TIA's Opp'n, at p. 30), without setting forth facts demonstrating that AT & T actually delayed the provisioning of service. Accordingly, any claim based on this assertion is dismissed.

of action arising under the Communications Act which provides for "exemplary damages" due to a party's "willful, malicious, oppressive, and fraudulent" acts "taken with deliberate disregard for plaintiff's rights." Accordingly, TIA's Twelfth Claim for Relief is dismissed with prejudice.

### D. *Unfair Competition Pursuant to Federal and State Common Law, and the Lanham Act*

Finally, TIA's Thirteenth Claim for Relief alleges that AT & T violated federal common law, the Lanham Act and New York State's unfair competition law because of acts taken with respect to TIA, "including without limitation, misuse of proprietary and confidential customer information and commercially unethical acts and practices." (Second Amended Compl., at ¶¶ 285–288). This Claim for Relief is dismissed with prejudice.

■ Generally, "there is no federal common law of unfair competition;" a claim for relief must "rest on a federal statute which defines and provides relief for this type of tort." *Water Tech. Corp. v. Calco, Ltd.*, 850 F.2d 660, 670 (Fed.Cir.), *cert. denied*, 488 U.S. 968, 109 S.Ct. 498, 102 L.Ed.2d 534 (1988); *see also, Erie R. Co. v. Tompkins*, 304 U.S. 64, 78–79, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) ("There is no federal general common law.").[27] Therefore, I dismiss that part of TIA's unfair competition based on any notion of federal common law.

■ TIA also argues that its federal unfair competition claim for relief arises under Section 43(a) of the Lanham Act. *See*, 15 U.S.C. § 1125(a) (1999). The Lanham Act, however, provides a "statutory remedy to a party injured by a competitor's 'false designation of origin' of its product, whether or not the party has secured a federally registered trademark." *Forschner Group, Inc. v. Arrow Trading Co., Inc.*, 124 F.3d 402, 407 (2d Cir.1997) (*"Forschner"*). There is no such charge here, and the Lanham Act does not extend to the claims made here by TIA. In any event, TIA has set forth no facts demonstrating that AT & T attempted to confuse consumers as to the origin of its own international call-turnaround services.

As to New York common law, the essence of unfair competition is the "bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods." *Forschner*, 124 F.3d at 408, quoting *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 34 (2d Cir.1995); *Katz Dochrermann & Epstein, Inc. v. Home Box Office*, No. 97 Civ. 7763, 1999 WL 179603, at *4 (S.D.N.Y. Mar. 31, 1999). TIA makes no showing of confusion or deception as to origin, or likelihood of confusion or description, and thus its claim based on New York state common law must also be dismissed. *Gruner + Jahr, USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1077 (2d Cir.1993), quoting *Western Pub. Co. v. Rose Art Industries, Inc.*, 910 F.2d 57, 59 (2d Cir.1990). Therefore, I hold that TIA's Thirteenth Claim for Relief alleging unfair competition should be dismissed, with prejudice.

## II. *AT & T'S COUNTERCLAIMS*

■ AT & T counterclaims to recover from TIA and from its parent company

---

27. In extremely rare instances, some courts have attempted to fashion a "federal rule of decision" where no specific federal law exists. *See generally, Sears, Roebuck & Co. v. Sears Realty Co., Inc.*, 932 F.Supp. 392 (N.D.N.Y. 1996); *see also, Texas Indus. Inc. v. Radcliff Materials*, 451 U.S. 630, 640, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981). Justice Scalia, in his opinion in *O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994), held that courts should embark upon this venture only when a federal rule of decision is necessary to protect uniquely federal interests, and that this should be "limited to situations where there is 'a significant conflict between some federal policy or interest and the use of state law.'" *Id.* at 87, 114 S.Ct. 2048. TIA has not shown anything of the sort here.

Telecom International,[28] for unpaid services provided under CT 1192, in the amounts of: $802,445.43 for the Megacom 800 Services, $36,915.19 for the T1.5 Services and in the amount of $58,029,892.74 for the Shortfall Charges provided for in CT 1192. AT & T also 'seeks $47,727.07 for the payment of post-warranty maintenance and servicing of Diamond Net, which it provided to TIA pursuant to the Equipment Agreements. In total, AT & T seeks $58,916,980.43 in damages, as well as pre-judgment interest. I hold that AT & T is entitled to summary judgment with respect to each of its first three counterclaims, but in an amount to be determined by trial. Furthermore, I hold that AT & T is entitled to summary judgment in the amount of $47,727.07 for the payment of the post-warranty maintenance. Since, as noted in the margin, Telecom International is entitled to judgment of dismissal, AT & T is entitled to judgment against TIA only.

### A. *The Filed Tariff Doctrine*

■■■ Section 203(a) of the Communications Act requires common carriers to file tariffs, and keep open for public inspection those tariffs, that set out "all charges for itself and its connecting carrier," and "the classifications, practices, and regulations affecting such charges." *See*, 47 U.S.C. § 203(a) (1999).[29] This statute "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority." *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981); *Marcus v. AT & T Corp.*, 138 F.3d 46, 57 (2d Cir.1998) (*"Marcus"*). Section 203(a) serves as the underlying basis for the filed tariff doctrine,[30] the central principle of the regulatory scheme for interstate telecommunications and common carriers. Pursuant to Section 203(a) and the filed tariff doctrine, a common carrier, like AT & T, must properly file its rates with the FCC, and must make those rates available to other customers seeking similar services. Moreover, the rights, "as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier." *American Tel. & Tel. v. Central Office Telephone, Inc.*, 524 U.S. 214, 118 S.Ct. 1956, 1965, 141 L.Ed.2d 222 (1998) (*"Central Office Telephone"*); *Keogh v. Chicago & Northwestern Ry. Co.*, 260 U.S. 156, 163, 43 S.Ct. 47, 67 L.Ed. 183 (1922) (*"Keogh"*). Thus, the filed tariff doctrine forbids any deviation, either increasing or decreasing the filed rate, under any pretext. *Louisville & Nashville R.R. Co. v. Maxwell*, 237 U.S. 94, 97, 35 S.Ct. 494, 59 L.Ed. 853 (1915) (*"Maxwell"*.). Knowledge of the publicly published rates to be charged is presumed,

---

**28.** AT & T argues that Telecom International controls and dominates TIA, by under-capitalization of TIA, and otherwise, and is therefore jointly and severally liable where TIA is held liable. I hold that AT & T has failed to come forward with facts tending to prove its assertion, and I dismiss AT & T's claims against Telecom International, with prejudice.

**29.** The text of § 203(a) states:

Every common carrier, except connecting carriers, shall, within such reasonable time as the Commission shall designate, file with the Commission and print and keep open for public inspection schedules showing all charges for itself and its connecting carriers for interstate and foreign wire or radio communication between the different points on its own system, and between points on its own system and points on the system of its connecting carriers or points

on the system of any other carrier subject to this chapter when a through route has been established, whether such charges are joint or separate, and showing the classifications, practices, and regulations affecting such charges. Such schedules shall contain such other information, and be printed in such form, and be posted and kept open for public inspection in such places, as the Commission may by regulation require, and each such schedule shall give notice of its effective date; and such common carrier shall furnish such schedules to each of its connecting carriers, and such connecting carriers shall keep such schedules open for inspection in such public places as the Commission may require.

47 U.S.C. § 203(a) (1999).

**30.** The filed tariff doctrine is also commonly referred to as the filed rate doctrine.

and is binding on both the carrier and its customer. *Maislin Indus., U.S. Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 126, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990) ("*Maislin*"). And, since "[r]ates [ ] do not exist in isolation," and are a function of the nature and quantity of services, the publicly filed rate and the same services must be afforded to all pursuant to the same terms. *Central Office Telephone*, 118 S.Ct. at 1963.

Determining the reasonableness of filed rates is the province of the FCC, and not the courts. *Fax Telecommunicaciones, Inc. v. AT & T*, 138 F.3d 479, 488–89 (2d Cir.1998) ("*Fax Telecommunicaciones*"); *Marcus*, 138 F.3d at 58. The policy vindicates the two "companion principles" underlying the filed tariff doctrine: (1) preventing carriers from engaging in price discrimination as between ratepayers (the nondiscrimination strand); [31] and (2) preserving the exclusive role of federal agencies in approving rates for telecommunications services that are "reasonable" by keeping courts out of the rate-making process, a function that regulatory agencies are more competent to perform (the nonjusticiability strand). [32] *Fax Telecommunicaciones*, 138 F.3d at 488.

Application of the filed tariff doctrine is not determined by the culpability of the parties' conduct or the possibility of "inequitable results." *Marcus*, 138 F.3d at 58. Indeed, the Supreme Court has held that "even if a carrier intentionally misrepresents its rate and a customer relies on the misrepresentation, the carrier cannot be held to the promised rate if it conflicts with the published tariff." *Central Office Telephone*, 118 S.Ct. at 1963; *Maislin*, 497 U.S. at 130–31, 110 S.Ct. 2759; *see also, Maxwell*, 237 U.S. at 97, 35 S.Ct. 494 ("This rule is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination."). Moreover, common law claims or defenses based on breach of contract and certain torts are pre-empted by the filed tariff doctrine; all claims for relief based on tariffed rates must be brought pursuant to the Communications Act of 1934. *Central Office Telephone*, 118 S.Ct. at 1964.[33]

## B. *AT & T's First and Third Counterclaim*

AT & T's First and Third Counterclaims are premised on the position that the properly filed contract tariff—that is, CT 1192 and only CT 1192—sets forth the "legal rate for the services" and, thus, TIA is obligated to pay AT & T for usage of these services, regardless of any common-law claims and defenses that it may interpose. *Central Office Telephone*, 118 S.Ct. at 1965 ("The rights as defined by the tariff cannot be varied or enlarged by either contract or

---

**31.** The nondiscrimination strand is designed as a shield to customers of common and telecommunications carriers, for "agents of carriers might easily become experts in the making of errors and mistakes in the quotation of rates to favored [customers], while other [customers] ... whose [business] is less important, would be compelled to pay the higher published rates." *Maislin*, 497 U.S. at 128, 110 S.Ct. 2759; *Fax Telecommunicaciones*, 138 F.3d at 489.

**32.** The Second Circuit has emphasized, "the nonjusticiability strand recognizes that '(1) legislatively appointed regulatory bodies have institutional competence to address the rate-making issues; (2) courts lack the competence to address rate-making issues; and (3)

the interference of courts in the rate-making process would subvert the authority of rate-setting bodies and undermine the regulatory regime.' " *Sun City Taxpayers' Ass'n v. Citizens Utils. Co.*, 45 F.3d 58, 62 (2d Cir.1995).

**33.** Thus, TIA's breach of contract claims with respect to the network services (breach of express warranty, mutual mistake, unilateral mistake, breach of the duty of good faith and fair dealing, and breach of contract), could also be dismissed because of the filed tariff doctrine. TIA's claims based on breach of the Equipment Agreements, however, were not precluded by the filed tariff doctrine because these claims were not based on the provision of tariffed services or the terms of a filed generic or contract tariff.

tort of the carrier."); *Reiter v. Cooper*, 507 U.S. 258, 266, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993); *Fax Telecommunicaciones*, 138 F.3d at 488–89.

For example, in *Fax Telecommunicaciones*, the Second Circuit affirmed a grant of summary judgment in favor of AT & T, entitling it to collect for services rendered pursuant to tariffed rates properly filed with the FCC, despite the fact that the customer claimed that AT & T promised to file an amended contract tariff charging significantly lower rates. In *Fax Telecommunicaciones*, Fax Telecommunicaciones, Inc. ("Fax"), a chain of telephone arcades providing service in Brooklyn and Queens, New York, sought to purchase long-distance services from AT & T at rates below which it paid to another long-distance service provider. During the negotiations, AT & T provided a draft version of an amended "Conquest" tariff, which AT & T represented it would file with the FCC. Fax accepted the terms in the draft contract tariff. While Fax waited for AT & T to file the contract tariff, AT & T provided Fax with services pursuant to its "CustomNet" tariff, a tariff with significantly higher rates than the proposed contract tariff Fax agreed to execute. AT & T represented to Fax that it would retroactively re-rate Fax upon the filing of the new contract tariff. Fax commenced receiving service in January 1994 and received bills charged pursuant to the "CustomNet" tariff. Fax complained numerous times about the rates charged, and received assurances from AT & T that its contract tariff would soon be filed. Ultimately, AT & T never filed the contract tariff and continued to seek collection for services rendered pursuant to the "CustomNet" Tariff. Fax brought suit alleging breach of contract, fraudulent misrepresentation and fraudulent inducement to contract; AT & T counterclaimed seeking payment for the services provided. The District Court granted AT & T summary judgment with respect to its counterclaims, and dismissed all but one of Fax's claims for relief based on the preclusive effect of the filed tariff doctrine. Fax appealed.

After a comprehensive review of the filed tariff doctrine, the Second Circuit refused Fax's request to enforce the unfiled contract tariff's rate structure. The Second Circuit held that the filed tariff doctrine forbids the charging of any rates except those properly filed with the FCC. *Fax Telecommunicaciones*, 138 F.3d at 489. It would be improper, the Second Circuit ruled, to enforce an unfiled tariff, even though promised, for that would involve a court in setting and applying a rate different from the publicly-filed tariff. *Id.* And, it would be improper to award damages to Fax, even under the grounds of fraud, tort, or contract, for an award of damages to Fax would allow Fax to pay a lower rate than other "CustomNet" customers, in contravention of the nondiscrimination strand of the filed tariff doctrine. *Id.* Consequently, the Second Circuit held that the filed tariff doctrine required AT & T to charge rates and collect payments for services provided in accordance with the applicable filed tariff, even though inequitable in the circumstance. *Id.* at 491.

■ The same principles apply here. TIA must pay AT & T in accordance with the terms of CT 1192 for the tariffed services it received, and is barred from raising any common law defenses. *Central Office Telephone*, 118 S.Ct. at 1965; *Fax Telecommunicaciones*, 138 F.3d at 488. Consequently, AT & T is entitled to summary judgment on its First and Third Counterclaims. However, since there are issues of fact with respect to the accuracy of the bills rendered by AT & T, the amount of judgment must be proven by AT & T at trial.

### C. *AT & T's Second Counterclaim*

AT & T makes similar arguments supporting summary judgment with respect to its Second Counterclaim seeking payment of the Shortfall Charges under CT 1192; the filed tariff doctrine requires a custom-

er to pay for services rendered according to the terms of the filed tariff, including terms that provide adjustments in the tariffed rate based on the failure of the customer to meet certain volume commitments prescribed by the terms of the filed tariff.

TIA contends that summary judgment is inappropriate because the Shortfall Charges constitute unenforceable penalty provisions void as against public policy; because the filed tariff doctrine is inapplicable in situations where the customer disputes liability; and because AT & T has made numerous misrepresentations with respect to the enforcement of the Shortfall Charges and the Business Downturn Clause. I hold that these arguments are meritless.

█ With respect to the issue of the reasonableness of the Shortfall Charges, I hold that the filed tariff doctrine and the doctrine of primary jurisdiction prevent me from entertaining such determinations. In short, I cannot void the Shortfall Charges because I would be substituting my judgment as to what would be a reasonable rate—something prohibited by the filed tariff doctrine and the doctrine of primary jurisdiction. Moreover, I would also be providing TIA with an extra-tariff benefit, unavailable to any other potential subscriber to CT 1192.[34]

█ In general, courts have concurrent jurisdiction with the FCC with respect to actions seeking damages pursuant to any of the provisions of the Communications Act. *See*, 47 U.S.C. § 207 (1999). Under the doctrine of primary jurisdiction, however, a district court may "refer" a matter otherwise within its original jurisdiction to an appropriate administrative agency which may have greater competence to resolve certain technical or policy issues.[35] *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 63–64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956) (*"Western Pac. R.R. Co."*). The Second Circuit's most recent pronouncement on primary jurisdiction holds that there is no "fixed formula" to determine whether an administrative agency has primary jurisdiction. *National Communications Ass'n., Inc. v. Amer., Tel. & Tel. Co.*, 46 F.3d 220, 222–23 (2d Cir.1995) (*"NCA"*); *see also, Western Pac. R.R. Co.*, 352 U.S. at 65, 77 S.Ct. 161. Generally, courts attempt to determine: (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made. *NCA*, 46 F.3d at 222.

Assessing whether the Shortfall Charges constitute unconscionable and unreasonable penalty provisions, is a question which is solely within the competence of the FCC, and one that the doctrine of primary jurisdiction (and the filed tariff doctrine) forbid judges from resolving. TIA asks me to invalidate the Shortfall Charges, the appropriate rate pursuant to the tariff—essentially, to engage in rate-setting. This I cannot do. As Mr. Richard, of AT & T, stated, the amount of the discount provided to a customer is based upon the volume commitments agreed to by the parties:

> There is no divorcing a customer's rate from its volume commitment under a contract tariff. Under Tariffs 1 and 2,

---

**34.** I note that the Shortfall Charges, notwithstanding their characterization, are more the reimbursement of the non-discounted rate payable by non-volume users. Here, the Shortfall Charges restore the normal rate that would otherwise have been payable pursuant to the terms of the filed generic tariffs.

**35.** "Referral" by the District Court is technically a misnomer. The District Courts do not actually refer matters to the FCC. The proper procedure is for the District Court to stay the matter, and one of the parties to the litigation files a complaint with the FCC. *See generally, Reiter v. Cooper*, 507 U.S. 258, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993) (describing referral under the Interstate Commerce Act).

AT & T provides its basic long-distance services at standard rates. Discounts off the standard level of rates contained in those tariffs are given in proportion to term and volume commitments.
(Richard March 4 Aff., at ¶ 15). Determining whether those discounts—that is the tariffed rate charged under the contract tariff—is reasonable is a function solely within the institutional competence of the FCC. Concomitantly, the establishing of liquidated damages or other charges to be incurred based on the failure to reach certain volume commitments is part and parcel to the setting of the tariffed rates. *AT & T Corp. v. PAB, Inc.*, 935 F.Supp. 584, 590 (E.D.Pa.1996). The charge for failure to reach the volume commitment is the flip-side to the actual discount provided in the contract tariff as compared to the generic tariffs incorporated therein.

All of the cases cited by TIA, save one, in which liquidated damages provisions have been invalidated, were before the FCC, not district courts and, in any event, provide scant support that the Shortfall Charges constitute unreasonable charges. *See, In re RCA American Communications*, 86 F.C.C.2d 1197, 1204–05 (1981); *Halprin, Temple, Goodman & Sugrue v. MCI*, 8 F.C.C.R. 7315 (1993) (*"Halprin"*). In *In re RCA American Communications*, the FCC invalidated a mid-term amendment to a properly filed tariff which modified "the length of the service terms, the termination liability, the elimination of certain grades of service, the requirement that some customers upgrade their services, and the length of the notice periods for renewal." *In re RCA American Communications*, 86 F.C.C.2d at 1202–03. Our case, in contrast, does not involve a mid-stream amendment to a previously negotiated tariff. In *Halprin*, the FCC held

that the description in MCI's tariff concerning "non-subscriber rates" was not "clear and explicit," that MCI's practice of charging non-subscriber rates for "direct-dialed calls" was unreasonable; thus the FCC did "not reach the issue of the reasonableness of MCI's Non–Subscriber rates." *Halprin*, 8 F.C.C.R. 7315, ¶ 1. We are not presented with any such issues. The one district court case cited by TIA is also inapposite because it involved the application of a specific Interstate Commerce Commission[36] regulatory scheme with respect to the imposition of liquidated damages. *Robins Motor Trans. v. Associated Rigging & Hauling Corp.*, 944 F.Supp. 409 (E.D.Pa.1996); *see,* 49 C.F.R. § 1320, *et. seq.* There are no equivalent regulations and rules under the Communications Act or the FCC's Reseller rules.[37]

The Second Circuit's opinion in *NCA* also does not buttress TIA's claim that a district court may determine the reasonableness of the Shortfall Charges. In *NCA*, a reseller brought suit alleging that AT & T's refusal to provide a discounted rate, based on a provision of a tariff providing such a discounted rate where a user had a good payment history, constituted an unjust and unreasonable practice. The District Court invoked the doctrine of primary jurisdiction, holding that only the FCC could determine "the validity of the billing practice [ ] at issue." *NCA*, 46 F.3d at 222. The Second Circuit reversed and remanded, holding that determining whether a reseller qualified for a reduced rate specified in the tariff did not involve interpreting the reasonableness of the tariff's terms, but rather, the determination of a simple factual question: "whether [the reseller] had timely paid its bills." *Id.* at 223. In short, *NCA* involved, not the attempt to fix a reasonable non-tariff rate or

---

**36.** The Interstate Commerce Commission is now known as the Surface Transportation Board.

**37.** Neither party suggests staying this matter and "referring" it to the FCC under the doctrine of primary jurisdiction. Indeed, TIA has not made a motion seeking a stay of this action pending FCC resolution, and during oral argument, counsel for TIA asked me not to refer this matter to the FCC.

the determination of the reasonableness of a rate, but rather the proper enforcement of the terms of a tariff. *See also, C.A.B. v. Aeromatic Travel Corp.*, 489 F.2d 251, 253 (2d Cir.1973). Here, on the other hand, TIA seeks to assess the reasonableness of the Shortfall Charges. As a district judge, I cannot engage in such a determination.

Even assuming, *arguendo,* I had competence to determine the reasonableness of the Shortfall Charges, I would find them to be reasonable. TIA made a commitment to purchase $53 million worth of network services from AT & T over the course of the three-year term of CT 1192, based on projections that TIA supplied to AT & T. The Shortfall Charges represent a reasonable approximation to that which AT & T expected to receive, and essentially redress the discount provided by AT & T to TIA in reliance on TIA's commitment. As the Second Circuit has ruled, "the appropriate analysis is not whether a better quantification of damages could have been drafted by the contracting parties, but whether the amount of liquidated damages actually inserted in the contract is reasonable." *United Air Lines, Inc. v. Austin Travel Corp.*, 867 F.2d 737, 740 (2d Cir. 1989). The Shortfall Charges were a reasonable approximation at the time of contract execution of the just compensation AT & T expected to receive pursuant to CT 1192, and, thus, do not constitute a disproportionate exaction of damages by AT & T. AT & T and TIA were sophisticated players in the telecommunications field, represented by sophisticated professionals and experienced counsel. (Joyce Test., p. 200). The negotiations were arms-length, reflecting careful deliberative judgment on both sides. Thus, the facts surrounding the transaction do not provide a basis for voiding the Shortfall Charges as unconscionable or unlawful.

Finally, TIA contends that AT & T should not be permitted to recover Shortfall Charges because AT & T's equipment deficiencies made it impossible for TIA to perform, and because AT & T promised TIA that the Shortfall Charges would be excused—TIA's waiver argument. I have disposed of TIA's arguments in earlier sections of this decision. TIA received that which AT & T contracted to deliver, and TIA has only itself to blame for not invoking the Business Downturn Clause and initiating a procedure to reduce the effect of its failure to satisfy the Minimum Volume Commitments. This is not a case like *AT & T v. NOS Communications, Inc.*, 830 F.Supp. 225 (D.N.J.1993) (*"NOS Communications"*) or *AT & T v. The People's Network, Inc,* No. 92–3100, 1993 WL 248165 (D.N.J. Mar. 31, 1993) (*"People's Network"*). AT & T was held to have provided the services giving rise to its tariffed charges. TIA received, as I have held, the benefit of the bargain set out in its contracts with AT & T: the two Equipment Contracts and the CTO, and CT 1192 filed pursuant to the CTO.

Accordingly, I hold that AT & T is entitled to summary judgment with respect to its Second Counterclaim, entitling it to collect the Shortfall Charges. But, as noted with respect to AT & T's First and Third Counterclaims, in light of the issues of fact with respect to the accuracy of AT & T's bills, the exact amount of the Shortfall Charges must be proven by AT & T at trial.

### D. *AT & T's Fourth Counterclaim*

Finally, AT & T seeks payment for maintenance provided to TIA pursuant to the terms of the Equipment Agreements. Upon termination of the one-year warranty on the equipment, TIA contracted to pay for any post-warranty maintenance it received from AT & T. (Affidavit of Sherry Natoli, dated May 6, 1997, at ¶ 7 ("Natoli Aff.")). The terms and conditions of the Equipment Agreement specifies that payment for any maintenance received after termination of the warranty period is due "within 30 days from the invoice date." (Equipment Agreement, at § 11(B)). AT & T, and later Lucent Technologies, Inc.

("Lucent"),[38] submitted periodic bills to TIA seeking payment of the maintenance charges due and payable. (Natoli Aff., at Exs. C, D, and E). AT & T also asserts that it will provide TIA with a credit of $2,297.24 reversing charges for post-warranty maintenance services provided to TIA after Lucent's termination of the Equipment Agreements on February 16, 1997. TIA has not disputed the accuracy of the maintenance bills provided by AT & T; indeed, TIA's papers are utterly silent with regard to AT & T's Fourth Counterclaim. Thus, AT & T is entitled to summary judgment with respect to its fourth counterclaim, in the amount of $50,024.31, less the $2,297.24 credit, or $47,727.07.

## CONCLUSION

Accordingly, I dismiss with prejudice all of TIA's Claims for Relief, except for the portion of its Second Claim for Relief alleging breach of the standard specifications provided in the Equipment Agreements, and TIA's Eleventh Claim for Relief alleging delayed and inaccurate bills in violation of the provision of Sections 201 and 203 of the Communications Act.

With respect to AT & T's Counterclaims, I grant summary judgment in favor of AT & T with respect to its First, Second and Third Counterclaims, leaving the amount of judgment to be decided at trial. I grant AT & T summary judgment on its Fourth Counterclaim, in the amount of $47,727.07. Finally, the parties are directed to appear for a final pre-trial conference on Thursday, September 30, 1999, at 5:00 p.m., in Courtroom 14D, United States Courthouse, Southern District of New York, 500 Pearl Street, with regard to the trial on the standard specifications scheduled to begin on Monday, October 11, 1999.

38. In February 1996, AT & T spun off its Global Business Communications Services division as a separate corporation, Lucent.